## MILLER-EL *v.* COCKRELL, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION

No. 01–7662. Argued October 16, 2002—Decided February 25, 2003

324

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SCALIA, SOUTER, GINSBURG, and BREYER, JJ., joined. SCALIA, J., filed a concurring opinion, *post*, p. 348. THOMAS, J., filed a dissenting opinion, *post*, p. 354.

*Seth P. Waxman* argued the cause for petitioner. With him on the briefs were *David W. Ogden, Robin A. Lenhardt, Jim Marcus,* and *Andrew Hammel.*

*Gena Bunn,* Assistant Attorney General of Texas, argued the cause for respondent. With her on the brief were *John Cornyn,* Attorney General, *Howard G. Baldwin, Jr.,* First Assistant Attorney General, *Michael T. McCaul,* Deputy

Attorney General, and *Edward L. Marshall, Charles A. Palmer*, and *Deni S. Garcia*, Assistant Attorneys General.*

JUSTICE KENNEDY delivered the opinion of the Court.

In this case we once again examine when a state prisoner can appeal the denial or dismissal of his petition for writ of habeas corpus. In 1986 two Dallas County assistant district attorneys used peremptory strikes to exclude 10 of the 11 African-Americans eligible to serve on the jury which tried petitioner Thomas Joe Miller-El. During the ensuing 17 years, petitioner has been unsuccessful in establishing, in either state or federal court, that his conviction and death sentence must be vacated because the jury selection procedures violated the Equal Protection Clause and our holding in *Batson* v. *Kentucky*, 476 U. S. 79 (1986). The claim now arises in a federal petition for writ of habeas corpus. The procedures and standards applicable in the case are controlled by the habeas corpus statute codified at Title 28, chapter 153, of the United States Code, most recently amended in a substantial manner by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). In the interest of finality AEDPA constrains a federal court's power to disturb state-court convictions.

The United States District Court for the Northern District of Texas, after reviewing the evidence before the state trial court, determined that petitioner failed to establish a constitutional violation warranting habeas relief. The Court of Appeals for the Fifth Circuit, concluding there was insufficient merit to the case, denied a certificate of appeal-

---

*Briefs of *amici curiae* urging reversal were filed for Former Prosecutors and Judges by *Elisabeth Semel, Charles D. Weisselberg*, and *Carter G. Phillips;* and for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Elaine R. Jones, Norman J. Chachkin, James L. Cott, George Kendall, Deborah Fins*, and *Miriam Gohara*.

ability (COA) from the District Court's determination. The COA denial is the subject of our decision.

At issue here are the standards AEDPA imposes before a court of appeals may issue a COA to review a denial of habeas relief in the district court. Congress mandates that a prisoner seeking postconviction relief under 28 U. S. C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, petitioner must first seek and obtain a COA. In resolving this case we decide again that when a habeas applicant seeks permission to initiate appellate review of the dismissal of his petition, the court of appeals should limit its examination to a threshold inquiry into the underlying merit of his claims. *Slack* v. *McDaniel*, 529 U. S. 473, 481 (2000). Consistent with our prior precedent and the text of the habeas corpus statute, we reiterate that a prisoner seeking a COA need only demonstrate "a substantial showing of the denial of a constitutional right." 28 U. S. C. § 2253(c)(2). A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further. *Slack*, *supra*, at 484. Applying these principles to petitioner's application, we conclude a COA should have issued.

## I

### A

Petitioner, his wife Dorothy Miller-El, and one Kenneth Flowers robbed a Holiday Inn in Dallas, Texas. They emptied the cash drawers and ordered two employees, Doug Walker and Donald Hall, to lie on the floor. Walker and Hall were gagged with strips of fabric, and their hands and feet were bound. Petitioner asked Flowers if he was going to kill Walker and Hall. When Flowers hesitated or refused,

petitioner shot Walker twice in the back and shot Hall in the side. Walker died from his wounds.

The State indicted petitioner for capital murder. He pleaded not guilty, and jury selection took place during five weeks in February and March 1986. When *voir dire* had been concluded, petitioner moved to strike the jury on the grounds that the prosecution had violated the Equal Protection Clause of the Fourteenth Amendment by excluding African-Americans through the use of peremptory challenges. Petitioner's trial occurred before our decision in *Batson, supra,* and *Swain* v. *Alabama,* 380 U. S. 202 (1965), was then the controlling precedent. As *Swain* required, petitioner sought to show that the prosecution's conduct was part of a larger pattern of discrimination aimed at excluding African-Americans from jury service. In a pretrial hearing held on March 12, 1986, petitioner presented extensive evidence in support of his motion. The trial judge, however, found "no evidence . . . that indicated any systematic exclusion of blacks as a matter of policy by the District Attorney's office; while it may have been done by individual prosecutors in individual cases." App. 813. The state court then denied petitioner's motion to strike the jury. *Ibid.* Twelve days later, the jury found petitioner guilty; and the trial court sentenced him to death.

Petitioner appealed to the Texas Court of Criminal Appeals. While the appeal was pending, on April 30, 1986, the Court decided *Batson* v. *Kentucky* and established its three-part process for evaluating claims that a prosecutor used peremptory challenges in violation of the Equal Protection Clause. First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. 476 U. S., at 96–97. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. *Id.,* at 97–98. Third, in light of the parties' submissions, the trial court must deter-

mine whether the defendant has shown purposeful discrimination. *Id.*, at 98.

After acknowledging petitioner had established an inference of purposeful discrimination, the Texas Court of Criminal Appeals remanded the case for new findings in light of *Batson. Miller-El* v. *State,* 748 S. W. 2d 459 (1988). A post-trial hearing was held on May 10, 1988 (a little over two years after petitioner's jury had been empaneled). There, the original trial court admitted all the evidence presented at the *Swain* hearing and further evidence and testimony from the attorneys in the original trial. App. 843–844.

On January 13, 1989, the trial court concluded that petitioner's evidence failed to satisfy step one of *Batson* because it "did not even raise an inference of racial motivation in the use of the state's peremptory challenges" to support a prima facie case. App. 876. Notwithstanding this conclusion, the state court determined that the State would have prevailed on steps two and three because the prosecutors had offered credible, race-neutral explanations for each African-American excluded. The court further found "no disparate prosecutorial examination of any of the veniremen in question" and "that the primary reasons for the exercise of the challenges against each of the veniremen in question [was] their reluctance to assess or reservations concerning the imposition of the death penalty." *Id.*, at 878. There was no discussion of petitioner's other evidence.

The Texas Court of Criminal Appeals denied petitioner's appeal, and we denied certiorari. *Miller-El* v. *Texas,* 510 U. S. 831 (1993). Petitioner's state habeas proceedings fared no better, and he was denied relief by the Texas Court of Criminal Appeals.

Petitioner filed a petition for writ of habeas corpus in Federal District Court pursuant to 28 U. S. C. § 2254. Although petitioner raised four issues, we concern ourselves here with only petitioner's jury selection claim premised on *Batson.* The Federal Magistrate Judge who considered the merits

was troubled by some of the evidence adduced in the state-court proceedings. He, nevertheless, recommended, in deference to the state courts' acceptance of the prosecutors' race-neutral justifications for striking the potential jurors, that petitioner be denied relief. The United States District Court adopted the recommendation. Pursuant to § 2253, petitioner sought a COA from the District Court, and the application was denied. Petitioner renewed his request to the Court of Appeals for the Fifth Circuit, and it also denied the COA.

The Court of Appeals noted that, under controlling habeas principles, a COA will issue " 'only if the applicant has made a substantial showing of the denial of a constitutional right.' " *Miller-El* v. *Johnson*, 261 F. 3d 445, 449 (2001) (quoting 28 U. S. C. § 2253(c)(2)). Citing our decision in *Slack* v. *McDaniel*, 529 U. S. 473 (2000), the court reasoned that "[a] petitioner makes a 'substantial showing' when he demonstrates that his petition involves issues which are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are adequate to deserve encouragement to proceed further." 261 F. 3d, at 449. The Court of Appeals also interjected the requirements of 28 U. S. C. § 2254 into the COA determination: "As an appellate court reviewing a federal habeas petition, we are required by § 2254(d)(2) to presume the state court findings correct unless we determine that the findings result in a decision which is unreasonable in light of the evidence presented. And the unreasonableness, if any, must be established by clear and convincing evidence. *See* 28 U. S. C. § 2254(e)(1)." 261 F. 3d, at 451.

Applying this framework to petitioner's COA application, the Court of Appeals concluded "that the state court's findings are not unreasonable and that Miller-El has failed to present clear and convincing evidence to the contrary." *Id.*, at 452. As a consequence, the court "determined that the state court's adjudication neither resulted in a decision that

was unreasonable in light of the evidence presented nor resulted in a decision contrary to clearly established federal law as determined by the Supreme Court," *ibid.;* and it denied petitioner's request for a COA. We granted certiorari. 534 U. S. 1122 (2002).

## B

While a COA ruling is not the occasion for a ruling on the merit of petitioner's claim, our determination to reverse the Court of Appeals counsels us to explain in some detail the extensive evidence concerning the jury selection procedures. Petitioner's evidence falls into two broad categories. First, he presented to the state trial court, at a pretrial *Swain* hearing, evidence relating to a pattern and practice of race discrimination in the *voir dire.* Second, two years later, he presented, to the same state court, evidence that directly related to the conduct of the prosecutors in his case. We discuss the latter first.

A comparative analysis of the venire members demonstrates that African-Americans were excluded from petitioner's jury in a ratio significantly higher than Caucasians were. Of the 108 possible jurors reviewed by the prosecution and defense, 20 were African-American. Nine of them were excused for cause or by agreement of the parties. Of the 11 African-American jurors remaining, however, all but 1 were excluded by peremptory strikes exercised by the prosecutors. On this basis 91% of the eligible black jurors were removed by peremptory strikes. In contrast the prosecutors used their peremptory strikes against just 13% (4 out of 31) of the eligible nonblack prospective jurors qualified to serve on petitioner's jury.

These numbers, while relevant, are not petitioner's whole case. During *voir dire,* the prosecution questioned venire members as to their views concerning the death penalty and their willingness to serve on a capital case. Responses that disclosed reluctance or hesitation to impose capital punishment were cited as a justification for striking a potential

juror for cause or by peremptory challenge. *Wainwright* v. *Witt*, 469 U. S. 412 (1985). The evidence suggests, however, that the manner in which members of the venire were questioned varied by race. To the extent a divergence in responses can be attributed to the racially disparate mode of examination, it is relevant to our inquiry.

Most African-Americans (53%, or 8 out of 15) were first given a detailed description of the mechanics of an execution in Texas:

> "[I]f those three [sentencing] questions are answered yes, at some point[,] Thomas Joe Miller-El will be taken to Huntsville, Texas. He will be placed on death row and at some time will be taken to the death house where he will be strapped on a gurney, an IV put into his arm and he will be injected with a substance that will cause his death . . . as the result of the verdict in this case if those three questions are answered yes." App. 215.

Only then were these African-American venire members asked whether they could render a decision leading to a sentence of death. Very few prospective white jurors (6%, or 3 out of 49) were given this preface prior to being asked for their views on capital punishment. Rather, all but three were questioned in vague terms: "Would you share with us . . . your personal feelings, if you could, in your own words how you do feel about the death penalty and capital punishment and secondly, do you feel you could serve on this type of a jury and actually render a decision that would result in the death of the Defendant in this case based on the evidence?" *Id.*, at 506.

There was an even more pronounced difference, on the apparent basis of race, in the manner the prosecutors questioned members of the venire about their willingness to impose the minimum sentence for murder. Under Texas law at the time of petitioner's trial, an unwillingness to do so warranted removal for cause. *Huffman* v. *State*, 450 S. W.

2d 858, 861 (Tex. Crim. App. 1970), vacated in part, 408 U. S. 936 (1972). This strategy normally is used by the defense to weed out pro-state members of the venire, but, ironically, the prosecution employed it here. The prosecutors first identified the statutory minimum sentence of five years' imprisonment to 34 out of 36 (94%) white venire members, and only then asked: "If you hear a case, to your way of thinking [that] calls for and warrants and justifies five years, you'll give it?" App. 509. In contrast, only one out of eight (12.5%) African-American prospective jurors were informed of the statutory minimum before being asked what minimum sentence they would impose. The typical questioning of the other seven black jurors was as follows:

> "[Prosecutor]: Now, the maximum sentence for [murder] . . . is life under the law. Can you give me an idea of just your personal feelings what you feel a minimum sentence should be for the offense of murder the way I've set it out for you?
>
> "[Juror]: Well, to me that's almost like it's premeditated. But you said they don't have a premeditated statute here in Texas.
>
> . . . . .
>
> "[Prosecutor]: Again, we're not talking about self-defense or accident or insanity or killing in the heat of passion or anything like that. We're talking about the knowing—
>
> "[Juror]: I know you said the minimum. The minimum amount that I would say would be at least twenty years." *Id.*, at 226–227.

Furthermore, petitioner points to the prosecution's use of a Texas criminal procedure practice known as jury shuffling. This practice permits parties to rearrange the order in which members of the venire are examined so as to increase the likelihood that visually preferable venire members will be moved forward and empaneled. With no information about

the prospective jurors other than their appearance, the party requesting the procedure literally shuffles the juror cards, and the venire members are then reseated in the new order. Tex. Code Crim. Proc. Ann., Art. 35.11 (Vernon Supp. 2003). Shuffling affects jury composition because any prospective jurors not questioned during *voir dire* are dismissed at the end of the week, and a new panel of jurors appears the following week. So jurors who are shuffled to the back of the panel are less likely to be questioned or to serve.

On at least two occasions the prosecution requested shuffles when there were a predominant number of African-Americans in the front of the panel. On yet another occasion the prosecutors complained about the purported inadequacy of the card shuffle by a defense lawyer but lodged a formal objection only after the postshuffle panel composition revealed that African-American prospective jurors had been moved forward.

Next, we turn to the pattern and practice evidence adduced at petitioner's pretrial *Swain* hearing. Petitioner subpoenaed a number of current and former Dallas County assistant district attorneys, judges, and others who had observed firsthand the prosecution's conduct during jury selection over a number of years. Although most of the witnesses denied the existence of a systematic policy to exclude African-Americans, others disagreed. A Dallas County district judge testified that, when he had served in the District Attorney's Office from the late-1950's to early-1960's, his superior warned him that he would be fired if he permitted any African-Americans to serve on a jury. Similarly, another Dallas County district judge and former assistant district attorney from 1976 to 1978 testified that he believed the office had a systematic policy of excluding African-Americans from juries.

Of more importance, the defense presented evidence that the District Attorney's Office had adopted a formal policy to exclude minorities from jury service. A 1963 circular by the

District Attorney's Office instructed its prosecutors to exercise peremptory strikes against minorities: "'Do not take Jews, Negroes, Dagos, Mexicans or a member of any minority race on a jury, no matter how rich or how well educated.'" App. 710. A manual entitled "Jury Selection in a Criminal Case" was distributed to prosecutors. It contained an article authored by a former prosecutor (and later a judge) under the direction of his superiors in the District Attorney's Office, outlining the reasoning for excluding minorities from jury service. Although the manual was written in 1968, it remained in circulation until 1976, if not later, and was available at least to one of the prosecutors in Miller-El's trial. *Id.*, at 749, 774, 783.

Some testimony casts doubt on the State's claim that these practices had been discontinued before petitioner's trial. For example, a judge testified that, in 1985, he had to exclude a prosecutor from trying cases in his courtroom for race-based discrimination in jury selection. Other testimony indicated that the State, by its own admission, once requested a jury shuffle in order to reduce the number of African-Americans in the venire. *Id.*, at 788. Concerns over the exclusion of African-Americans by the District Attorney's Office were echoed by Dallas County's Chief Public Defender.

This evidence had been presented by petitioner, in support of his *Batson* claim, to the state and federal courts that denied him relief. It is against this background that we examine whether petitioner's case should be heard by the Court of Appeals.

## II

### A

As mandated by federal statute, a state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U. S. C. § 2253. Before an appeal may be entertained, a prisoner who was denied habeas relief in the district court must first seek and

obtain a COA from a circuit justice or judge. This is a juris-
dictional prerequisite because the COA statute mandates
that "[u]nless a circuit justice or judge issues a certificate of
appealability, an appeal may not be taken to the court of
appeals. . . ." § 2253(c)(1). As a result, until a COA has
been issued federal courts of appeals lack jurisdiction to rule
on the merits of appeals from habeas petitioners.

A COA will issue only if the requirements of § 2253 have
been satisfied. "The COA statute establishes procedural
rules and requires a threshold inquiry into whether the cir-
cuit court may entertain an appeal." *Slack,* 529 U. S., at
482; *Hohn* v. *United States,* 524 U. S. 236, 248 (1998). As the
Court of Appeals observed in this case, § 2253(c) permits the
issuance of a COA only where a petitioner has made a "sub-
stantial showing of the denial of a constitutional right." In
*Slack, supra,* at 483, we recognized that Congress codified
our standard, announced in *Barefoot* v. *Estelle,* 463 U. S. 880
(1983), for determining what constitutes the requisite show-
ing. Under the controlling standard, a petitioner must
"sho[w] that reasonable jurists could debate whether (or, for
that matter, agree that) the petition should have been re-
solved in a different manner or that the issues presented
were 'adequate to deserve encouragement to proceed fur-
ther.'" 529 U. S., at 484 (quoting *Barefoot, supra,* at 893,
n. 4).

The COA determination under § 2253(c) requires an over-
view of the claims in the habeas petition and a general as-
sessment of their merits. We look to the District Court's
application of AEDPA to petitioner's constitutional claims
and ask whether that resolution was debatable amongst ju-
rists of reason. This threshold inquiry does not require full
consideration of the factual or legal bases adduced in support
of the claims. In fact, the statute forbids it. When a court
of appeals sidesteps this process by first deciding the merits
of an appeal, and then justifying its denial of a COA based

on its adjudication of the actual merits, it is in essence deciding an appeal without jurisdiction.

To that end, our opinion in *Slack* held that a COA does not require a showing that the appeal will succeed. Accordingly, a court of appeals should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief. The holding in *Slack* would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with §2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the whole premise is that the prisoner " 'has already failed in that endeavor.' " *Barefoot, supra,* at 893, n. 4.

Our holding should not be misconstrued as directing that a COA always must issue. Statutes such as AEDPA have placed more, rather than fewer, restrictions on the power of federal courts to grant writs of habeas corpus to state prisoners. *Duncan* v. *Walker,* 533 U. S. 167, 178 (2001) (" 'AEDPA's purpose [is] to further the principles of comity, finality, and federalism' " (quoting *Williams* v. *Taylor,* 529 U. S. 420, 436 (2000))); *Williams* v. *Taylor,* 529 U. S. 362, 399 (2000) (opinion of O'CONNOR, J.). The concept of a threshold, or gateway, test was not the innovation of AEDPA. Congress established a threshold prerequisite to appealability in 1908, in large part because it was "concerned with the increasing number of frivolous habeas corpus petitions challenging capital sentences which delayed execution pending completion of the appellate process . . . ." *Barefoot, supra,* at 892, n. 3. By enacting AEDPA, using the specific standards the Court had elaborated earlier for the threshold test, Congress confirmed the necessity and the requirement of differential treatment for those appeals deserving of attention from those that plainly do not. It follows that issuance of a COA must not be *pro forma* or a matter of course.

A prisoner seeking a COA must prove "'something more than the absence of frivolity'" or the existence of mere "good faith" on his or her part. *Barefoot, supra,* at 893. We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail. As we stated in *Slack,* "[w]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 529 U. S., at 484.

## B

Since Miller-El's claim rests on a *Batson* violation, resolution of his COA application requires a preliminary, though not definitive, consideration of the three-step framework mandated by *Batson* and reaffirmed in our later precedents. *E. g., Purkett* v. *Elem,* 514 U. S. 765 (1995) *(per curiam); Hernandez* v. *New York,* 500 U. S. 352 (1991) (plurality opinion). Contrary to the state trial court's ruling on remand, the State now concedes that petitioner, Miller-El, satisfied step one: "[T]here is no dispute that Miller-El presented a prima facie claim" that prosecutors used their peremptory challenges to exclude venire members on the basis of race. Brief for Respondent 32. Petitioner, for his part, acknowledges that the State proceeded through step two by proffering facially race-neutral explanations for these strikes. Under *Batson,* then, the question remaining is step three: whether Miller-El "has carried his burden of proving purposeful discrimination." *Hernandez, supra,* at 359.

As we confirmed in *Purkett* v. *Elem,* 514 U. S., at 768, the critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persua-

siveness of the prosecutor's justification for his peremptory strike. At this stage, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Ibid.* In that instance the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.

In *Hernandez* v. *New York,* a plurality of the Court concluded that a state court's finding of the absence of discriminatory intent is "a pure issue of fact" accorded significant deference:

> "Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson,* the finding 'largely will turn on evaluation of credibility.' 476 U. S., at 98, n. 21. In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' *Wainwright* v. *Witt,* 469 U. S. 412, 428 (1985), citing *Patton* v. *Yount,* 467 U. S. 1025, 1038 (1984)." 500 U. S., at 365.

Deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire,* is not as well positioned as the trial court is to make credibility determinations. "[I]f an appellate court accepts a trial court's finding that a prosecutor's race-neutral explanation for his peremptory challenges should be believed, we fail to see how the

appellate court nevertheless could find discrimination. The credibility of the prosecutor's explanation goes to the heart of the equal protection analysis, and once that has been settled, there seems nothing left to review." *Id.,* at 367.

In the context of direct review, therefore, we have noted that "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal" and will not be overturned unless clearly erroneous. *Id.,* at 364. A federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system. Where 28 U. S. C. § 2254 applies, our habeas jurisprudence embodies this deference. Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2); see also *Williams,* 529 U. S., at 399 (opinion of O'CONNOR, J.).

Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence. In the context of the threshold examination in this *Batson* claim the issuance of a COA can be supported by any evidence demonstrating that, despite the neutral explanation of the prosecution, the peremptory strikes in the final analysis were race based. It goes without saying that this includes the facts and circumstances that were adduced in support of the prima facie case. Cf. *Reeves* v. *Sanderson Plumbing Products, Inc.,* 530 U. S. 133 (2000) (in action under Title VII of the Civil Rights Act of 1964, employee's prima facie case and evidence that employer's

race-neutral response was a pretext can support a finding of purposeful discrimination). Only after a COA is granted will a reviewing court determine whether the trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable and has been rebutted by clear and convincing evidence to the contrary. At this stage, however, we only ask whether the District Court's application of AEDPA deference, as stated in §§ 2254(d)(2) and (e)(1), to petitioner's *Batson* claim was debatable amongst jurists of reason.

C

Applying these rules to Miller-El's application, we have no difficulty concluding that a COA should have issued. We conclude, on our review of the record at this stage, that the District Court did not give full consideration to the substantial evidence petitioner put forth in support of the prima facie case. Instead, it accepted without question the state court's evaluation of the demeanor of the prosecutors and jurors in petitioner's trial. The Court of Appeals evaluated Miller-El's application for a COA in the same way. In ruling that petitioner's claim lacked sufficient merit to justify appellate proceedings, the Court of Appeals recited the requirements for granting a writ under § 2254, which it interpreted as requiring petitioner to prove that the state-court decision was objectively unreasonable by clear and convincing evidence.

This was too demanding a standard on more than one level. It was incorrect for the Court of Appeals, when looking at the merits, to merge the independent requirements of §§ 2254(d)(2) and (e)(1). AEDPA does not require petitioner to prove that a decision is objectively unreasonable by clear and convincing evidence. The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions. Subsection (d)(2) contains the unreasonable

requirement and applies to the granting of habeas relief rather than to the granting of a COA.

The Court of Appeals, moreover, was incorrect for an even more fundamental reason. Before the issuance of a COA, the Court of Appeals had no jurisdiction to resolve the merits of petitioner's constitutional claims. True, to the extent that the merits of this case will turn on the agreement or disagreement with a state-court factual finding, the clear and convincing evidence and objective unreasonableness standards will apply. At the COA stage, however, a court need not make a definitive inquiry into this matter. As we have said, a COA determination is a separate proceeding, one distinct from the underlying merits. *Slack,* 529 U. S., at 481; *Hohn,* 524 U. S., at 241. The Court of Appeals should have inquired whether a "substantial showing of the denial of a constitutional right" had been proved. Deciding the substance of an appeal in what should only be a threshold inquiry undermines the concept of a COA. The question is the debatability of the underlying constitutional claim, not the resolution of that debate.

In this case, the statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors. The prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members, and only one served on petitioner's jury. In total, 10 of the prosecutors' 14 peremptory strikes were used against African-Americans. Happenstance is unlikely to produce this disparity.

The case for debatability is not weakened when we examine the State's defense of the disparate treatment. The Court of Appeals held that "[t]he presumption of correctness is especially strong, where, as here, the trial court and state habeas court are one and the same." 261 F. 3d, at 449. As we have noted, the trial court held its *Batson* hearing two years after the *voir dire.* While the prosecutors had proffered contemporaneous race-neutral justifications for many

of their peremptory strikes, the state trial court had no occasion to judge the credibility of these explanations at that time because our equal protection jurisprudence then, dictated by *Swain*, did not require it. As a result, the evidence presented to the trial court at the *Batson* hearing was subject to the usual risks of imprecision and distortion from the passage of time.

In this case, three of the State's proffered race-neutral rationales for striking African-American jurors pertained just as well to some white jurors who were not challenged and who did serve on the jury. The prosecutors explained that their peremptory challenges against six African-American potential jurors were based on ambivalence about the death penalty; hesitancy to vote to execute defendants capable of being rehabilitated; and the jurors' own family history of criminality. In rebuttal of the prosecution's explanation, petitioner identified two empaneled white jurors who expressed ambivalence about the death penalty in a manner similar to their African-American counterparts who were the subject of prosecutorial peremptory challenges. One indicated that capital punishment was not appropriate for a first offense, and another stated that it would be "difficult" to impose a death sentence. Similarly, two white jurors expressed hesitation in sentencing to death a defendant who might be rehabilitated; and four white jurors had family members with criminal histories. As a consequence, even though the prosecution's reasons for striking African-American members of the venire appear race neutral, the application of these rationales to the venire might have been selective and based on racial considerations. Whether a comparative juror analysis would demonstrate the prosecutors' rationales to have been pretexts for discrimination is an unnecessary determination at this stage, but the evidence does make debatable the District Court's conclusion that no purposeful discrimination occurred.

We question the Court of Appeals' and state trial court's dismissive and strained interpretation of petitioner's evidence of disparate questioning. 261 F. 3d, at 452 ("The findings of the state court that there was no disparate questioning of the *Batson* jurors . . . [is] fully supported by the record"). Petitioner argues that the prosecutors' sole purpose in using disparate questioning was to elicit responses from the African-American venire members that reflected an opposition to the death penalty or an unwillingness to impose a minimum sentence, either of which justified for-cause challenges by the prosecution under the then-applicable state law. This is more than a remote possibility. Disparate questioning did occur. Petitioner submits that disparate questioning created the appearance of divergent opinions even though the venire members' views on the relevant subject might have been the same. It follows that, if the use of disparate questioning is determined by race at the outset, it is likely a justification for a strike based on the resulting divergent views would be pretextual. In this context the differences in the questions posed by the prosecutors are some evidence of purposeful discrimination. *Batson*, 476 U. S., at 97 ("Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose").

As a preface to questions about views the prospective jurors held on the death penalty, the prosecution in some instances gave an explicit account of the execution process. Of those prospective jurors who were asked their views on capital punishment, the preface was used for 53% of the African-Americans questioned on the issue but for just 6% of white persons. The State explains the disparity by asserting that a disproportionate number of African-American venire members expressed doubts as to the death penalty on their juror questionnaires. This cannot be accepted without further inquiry, however, for the State's own evidence is in-

consistent with that explanation. By the State's calculations, 10 African-American and 10 white prospective jurors expressed some hesitation about the death penalty on their questionnaires; however, of that group, 7 out of 10 African-Americans and only 2 out of 10 whites were given the explicit description.

There is an even greater disparity along racial lines when we consider disparate questioning concerning minimum punishments. Ninety-four percent of whites were informed of the statutory minimum sentence, compared to only twelve and a half percent of African-Americans. No explanation is proffered for the statistical disparity. *Pierre* v. *Louisiana*, 306 U. S. 354, 361–362 (1939) ("'The fact that the testimony . . . was not challenged by evidence appropriately direct, cannot be brushed aside.' Had there been evidence obtainable to contradict and disprove the testimony offered by petitioner, it cannot be assumed that the State would have refrained from introducing it" (quoting *Norris* v. *Alabama*, 294 U. S. 587, 594–595 (1935))). Indeed, while petitioner's appeal was pending before the Texas Court of Criminal Appeals, that court found a *Batson* violation where this precise line of disparate questioning on mandatory minimums was employed by one of the same prosecutors who tried the instant case. *Chambers* v. *State*, 784 S. W. 2d 29, 31 (Tex. Crim. App. 1989). It follows, in our view, that a fair interpretation of the record on this threshold examination in the COA analysis is that the prosecutors designed their questions to elicit responses that would justify the removal of African-Americans from the venire. *Batson, supra*, at 93 ("Circumstantial evidence of invidious intent may include proof of disproportionate impact. . . . We have observed that under some circumstances proof of discriminatory impact 'may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds'").

We agree with petitioner that the prosecution's decision to seek a jury shuffle when a predominant number of African-Americans were seated in the front of the panel, along with its decision to delay a formal objection to the defense's shuffle until after the new racial composition was revealed, raise a suspicion that the State sought to exclude African-Americans from the jury. Our concerns are amplified by the fact that the state court also had before it, and apparently ignored, testimony demonstrating that the Dallas County District Attorney's Office had, by its own admission, used this process to manipulate the racial composition of the jury in the past. App. 788 (noting that a prosecutor admitted to requesting a jury shuffle "because a predominant number of the first six, eight or ten jurors were blacks"). Even though the practice of jury shuffling might not be denominated as a *Batson* claim because it does not involve a peremptory challenge, the use of the practice here tends to erode the credibility of the prosecution's assertion that race was not a motivating factor in the jury selection.

Finally, in our threshold examination, we accord some weight to petitioner's historical evidence of racial discrimination by the District Attorney's Office. Evidence presented at the *Swain* hearing indicates that African-Americans almost categorically were excluded from jury service. *Batson, supra,* at 94 ("Proof of systematic exclusion from the venire raises an inference of purposeful discrimination because the 'result bespeaks discrimination'"); *Vasquez* v. *Hillery,* 474 U. S. 254, 259 (1986) ("As early as 1942, this Court rejected a contention that absence of blacks on the grand jury was insufficient to support an inference of discrimination, summarily asserting that 'chance or accident could hardly have accounted for the continuous omission of negroes from the grand jury lists for so long a period as sixteen years or more'" (quoting *Hill* v. *Texas,* 316 U. S. 400, 404 (1942))); *Hernandez* v. *Texas,* 347 U. S. 475, 482 (1954) ("But it taxes our credulity to say that mere chance resulted in there being

no members of this class among the over six thousand jurors called in the past 25 years"). Only the Federal Magistrate Judge addressed the import of this evidence in the context of a *Batson* claim; and he found it both unexplained and disturbing. Irrespective of whether the evidence could prove sufficient to support a charge of systematic exclusion of African-Americans, it reveals that the culture of the District Attorney's Office in the past was suffused with bias against African-Americans in jury selection. This evidence, of course, is relevant to the extent it casts doubt on the legitimacy of the motives underlying the State's actions in petitioner's case. Even if we presume at this stage that the prosecutors in Miller-El's case were not part of this culture of discrimination, the evidence suggests they were likely not ignorant of it. Both prosecutors joined the District Attorney's Office when assistant district attorneys received formal training in excluding minorities from juries. The supposition that race was a factor could be reinforced by the fact that the prosecutors marked the race of each prospective juror on their juror cards.

In resolving the equal protection claim against petitioner, the state courts made no mention of either the jury shuffle or the historical record of purposeful discrimination. We adhere to the proposition that a state court need not make detailed findings addressing all the evidence before it. This failure, however, does not diminish its significance. Our concerns here are heightened by the fact that, when presented with this evidence, the state trial court somehow reasoned that there was not even the inference of discrimination to support a prima facie case. This was clear error, and the State declines to defend this particular ruling. "If these general assertions were accepted as rebutting a defendant's prima facie case, the Equal Protection Clause 'would be but a vain and illusory requirement.'" *Batson*, 476 U. S., at 98 (quoting *Norris*, 294 U. S., at 598).

To secure habeas relief, petitioner must demonstrate that a state court's finding of the absence of purposeful discrimination was incorrect by clear and convincing evidence, 28 U. S. C. § 2254(e)(1), and that the corresponding factual determination was "objectively unreasonable" in light of the record before the court. The State represents to us that petitioner will not be able to satisfy his burden. That may or may not be the case. It is not, however, the question before us. The COA inquiry asks only if the District Court's decision was debatable. Our threshold examination convinces us that it was.

The judgment of the Fifth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, concurring.

I join the Court's opinion, but write separately for two reasons: First, to explain why I believe the Court's willingness to consider the Antiterrorism and Effective Death Penalty Act of 1996's (AEDPA) limits on habeas relief in deciding whether to issue a certificate of appealability (COA) is in accord with the text of 28 U. S. C. § 2253(c). Second, to discuss some of the evidence on the State's side of the case—which, though inadequate (as the Court holds) to make the absence of a claimed violation of *Batson* v. *Kentucky*, 476 U. S. 79 (1986), undebatable, still makes this, in my view, a very close case.

I

Many Court of Appeals decisions have denied applications for a COA only after concluding that the applicant was not entitled to habeas relief on the merits—without even analyzing whether the applicant had made a substantial showing of a denial of a constitutional right. See, *e. g., Kasi* v. *Angelone*, 300 F. 3d 487 (CA4 2002); *Wheat* v. *Johnson*, 238 F. 3d

357 (CA5 2000).* The Court today disapproves this approach, which improperly resolves the merits of the appeal during the COA stage. *Ante,* at 331, 335–338. Less clear from the Court's opinion, however, is why a "circuit justice or judge," in deciding whether to issue a COA, must "look to *the District Court's application of AEDPA* to [a habeas petitioner's] constitutional claims and ask whether *that resolution* was debatable amongst jurists of reason." *Ante,* at 336 (emphasis added). How the district court applied AEDPA has nothing to do with whether a COA applicant has made "a substantial showing of the denial of a constitutional right," as required by 28 U. S. C. § 2253(c)(2), so the AEDPA standard should seemingly have no role in the COA inquiry.

Section 2253(c)(2), however, provides that "[a] certificate of appealability *may issue . . . only if* the applicant has made a substantial showing of the denial of a constitutional right." (Emphasis added.) A "substantial showing" *does not entitle* an applicant to a COA; it is a necessary and not a sufficient condition. Nothing in the text of § 2253(c)(2) prohibits a circuit justice or judge from imposing additional requirements, and one such additional requirement has been approved by this Court. See *Slack* v. *McDaniel,* 529 U. S. 473, 484 (2000) (holding that a habeas petitioner seeking to appeal a district court's denial of habeas relief on procedural grounds must not only make a substantial showing of the denial of a constitutional right but *also* must demonstrate that jurists of reason would find it debatable whether the district court was correct in its procedural ruling).

The Court today imposes another additional requirement: A circuit justice or judge must deny a COA, even when the habeas petitioner has made a substantial showing that his

---

*In what can be regarded as a logical development from the error of analyzing a request for a COA like a merits appeal, some courts have simply allowed merits appeals to be taken *without* a COA—in flat contravention of 28 U. S. C. § 2253(c)(1)(A). See, *e. g., Bates* v. *Lee,* 308 F. 3d 411 (CA4 2002).

constitutional rights were violated, if all reasonable jurists would conclude that a substantive provision of the federal habeas statute bars relief. *Ante,* at 336. To give an example, suppose a state prisoner presents a constitutional claim that reasonable jurists might find debatable, but is unable to find any "clearly established" Supreme Court precedent in support of that claim (which was previously rejected on the merits in state-court proceedings). Under the Court's view, a COA must be denied, *even if* the habeas petitioner satisfies the "substantial showing of the denial of a constitutional right" requirement of § 2253(c)(2), because all reasonable jurists would agree that habeas relief is impossible to obtain under § 2254(d). This approach is consonant with *Slack,* in accord with the COA's purpose of preventing meritless habeas appeals, and compatible with the text of § 2253(c), which does not make the "substantial showing of the denial of a constitutional right" a sufficient condition for a COA.

## II

In applying the Court's COA standard to petitioner's case, we must ask whether petitioner has made a substantial showing of a *Batson* violation and also whether reasonable jurists could debate petitioner's ability to obtain habeas relief in light of AEDPA. The facts surrounding petitioner's *Batson* claims, when viewed in light of § 2254(e)(1)'s requirement that state-court factual determinations can be overcome only by clear and convincing evidence to the contrary, reveal this to be a close, rather than a clear, case for the granting of a COA.

Petitioner maintains that the following six African-American jurors were victims of racially motivated peremptory strikes: Edwin Rand, Wayman Kennedy, Roderick Bozeman, Billy Jean Fields, Joe Warren, and Carrol Boggess. As to each of them, the State proffered race-neutral explanations for its peremptory challenge. Five were challenged primarily because of their views on imposing the death pen-

alty (Rand, Kennedy, Bozeman, Warren, and Boggess), and one (Fields) was challenged because (among other reasons) his brother had been convicted of drug offenses and served time in prison. By asserting race-neutral reasons for the challenges, the State satisfied step two of *Batson.* See *Purkett* v. *Elem*, 514 U. S. 765, 767–768 (1995) *(per curiam).* Unless petitioner can make a substantial showing that (*i. e.*, a showing that reasonable jurists could debate whether) the State fraudulently recited these explanations as pretext for race discrimination, he has not satisfied the requirement of § 2253(c)(2). Moreover, because the state court entered a finding of fact that the prosecution's purported reasons for exercising its peremptory challenges were not pretextual, App. 878, a COA should not issue unless that finding can reasonably be thought to be contradicted by clear and convincing evidence. See § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence"). *Ante,* at 336.

The weakness in petitioner's *Batson* claims stems from his difficulty in identifying any unchallenged white venireman similarly situated to the six aforementioned African-American veniremen. Although petitioner claims that two white veniremen, Sandra Hearn and Marie Mazza, expressed views about the death penalty as ambivalent as those expressed by Rand, Kennedy, Bozeman, Warren, and Boggess, the *voir dire* transcripts do not clearly bear that out. Although Hearn initially stated that she thought the death penalty was inappropriate for first-time offenders, she also said, "I do not see any reason why I couldn't sit on a jury when you're imposing a death penalty." App. 694. She further stated that someone who was an extreme child abuser deserved the death penalty, whether or not it was a first-time offense. Reply Brief for Petitioner 14a. Hearn also made pro-prosecution statements about her distaste for criminal

defendants' use of psychiatric testimony to establish incompetency. *Id.*, at 17a. As for Mazza, her stated views on the death penalty were as follows: "It's kind of hard determining somebody's life, whether they live or die, but I feel that is something that is accepted in our courts now and it is something that—a decision that I think I could make one way or the other." App. 519.

Compare those statements with the sentiments expressed by the challenged African-American veniremen. Kennedy supported the death penalty only in cases of mass murder. "Normally I wouldn't say on just the average murder case— I would say no, not the death sentence." *Id.*, at 216. Bozeman supported the death penalty only "if there's no possible way to rehabilitate a person . . . I would say somebody mentally disturbed or something like that or say a Manson type or something like that." *Id.*, at 79. When asked by the prosecutors whether repeated criminal violent conduct would indicate that a person was beyond rehabilitation, Bozeman replied, "No, not really." *Ibid.* Warren refused to give any clear answer regarding his views on the death penalty despite numerous questions from the prosecutors. *Id.*, at 139–140 ("Well, there again, it goes back to the situation, you know, sometimes"); *id.*, at 140. When asked whether the death penalty accomplishes anything, Warren answered, "Yes and no. Sometimes I think it does and sometimes I think it don't *[sic]*. Sometimes you have mixed feelings about things like that." *Ibid.* When asked, "What do you think it accomplishes when you feel it does?," Warren replied, "I don't know." *Ibid.* Boggess referred to the death penalty as "murder," *id.*, at 197, and said, "whether or not I could actually go through with murder—with killing another person or taking another person's life, I just don't know. I'd have trouble with that," *ibid.* Rand is a closer case. His most ambivalent statement was "Can I do this? You know, right now I say I can, but tomorrow I might not." *Id.*, at 161 (internal quotation marks omitted). Later on

Rand did say that he could impose the death penalty as a juror. *Id.*, at 162–164. But Hearn and Mazza (the white jurors who were seated) also said that they could sit on a jury that imposed the death penalty. At most, petitioner has shown that one of these African-American veniremen (Rand) may have been no more ambivalent about the death penalty than white jurors Hearn and Mazza. That perhaps would have been enough to permit the state trial court, deciding the issue *de novo* after observing the demeanor of the prosecutors and the disputed jurors, to find a *Batson* violation. But in a federal habeas case, where a state court has previously entered factfindings that the six African-American jurors were not challenged because of their race, petitioner must provide "clear and convincing evidence" that the state court erred, and, when requesting a COA, must demonstrate that jurists of reason could debate whether this standard was satisfied. *Ante*, at 336.

Fields, the sixth African-American venireman who petitioner claims was challenged because of his race, supported capital punishment. However, his brother had several drug convictions and had served time in prison. App. 124. (Warren and Boggess, two of the African-American veniremen previously discussed, also had relatives with criminal convictions—Warren's brother had been convicted of fraud in relation to food stamps, *id.*, at 153, and Boggess had testified as a defense witness at her nephew's trial for theft, *id.*, at 211, and reported in her questionnaire that some of her cousins had problems with the law, Joint Lodging 43.) Of the four white veniremen who petitioner claims also had relatives with criminal histories and therefore "should have been struck" by the prosecution—three (Noad Vickery, Cheryl Davis, and Chatta Nix) were actually so pro-prosecution that *they were struck by the petitioner. Id.*, at 111. The fourth, Joan Weiner, had a son who had shoplifted at the age of 10. App. 511. That is hardly comparable to Fields's situation, and Weiner was a strong State's juror for

other reasons: She had relatives who worked in law enforcement, *id.*, at 510, and her support for the death penalty was clear and unequivocal, *id.*, at 506, 511.

For the above reasons, my conclusion that there is room for debate as to the merits of petitioner's *Batson* claim is far removed from a judgment that the State's explanations for its peremptory strikes were implausible.

\* \* \*

With these observations, I join the Court's opinion.

JUSTICE THOMAS, dissenting.

Unpersuaded by petitioner's claims, the state trial court found that "there was no purposeful discrimination by the prosecut[ion] in the use of . . . peremptory strikes," App. 878. This finding established that petitioner had failed to carry his burden at step three of the inquiry set out in *Batson* v. *Kentucky*, 476 U. S. 79 (1986). Title 28 U. S. C. § 2254(e)(1) requires that a federal habeas court "presum[e]" the state court's findings of fact "to be correct" unless petitioner can rebut the presumption "by clear and convincing evidence." The majority decides, without explanation, to ignore § 2254(e)(1)'s explicit command. I cannot. Because petitioner has not shown, by clear and convincing evidence, that any peremptory strikes of black veniremen were exercised because of race, he does not merit a certificate of appealability (COA). I respectfully dissent.

## I

### A

The Court agrees, *ante*, at 342, that the state court's finding at step three of *Batson* is a finding of fact ordinarily subject to § 2254(e)(1)'s presumption of correctness:

> "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual

issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

However, the Court implicitly rejects the obvious conclusion that the COA determination under § 2253(c) is part of a "proceeding instituted by an application for a writ of habeas corpus." Instead of presuming the state court's factfindings to be correct, as § 2254(e)(1) requires, the Court holds that petitioner need only show that reasonable jurists could disagree as to whether he can provide clear and convincing evidence that the finding was erroneous. *Ante,* at 341.

The Court's main justification for this conclusion is supposed fidelity to *Slack* v. *McDaniel,* 529 U. S. 473 (2000). See *ante,* at 338 ("'The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong'" (quoting *Slack, supra,* at 484)). But neither *Slack* nor any other decision of this Court addressing the COA procedure has ever considered a "constitutional claim" that turns entirely on issues of fact. In these circumstances, it is the text of § 2254(e)(1) that governs.

Unlike the majority, I begin with the plain text of the statute that instructs federal courts how to treat state-court findings of fact. At issue is what constitutes a "proceeding" for purposes of § 2254(e)(1). The word, "proceeding," means "[t]he regular and orderly progression of a lawsuit, including *all acts and events between* the time of commencement and the entry of judgment." Black's Law Dictionary 1221 (7th ed. 1999) (emphasis added). The COA, "standing alone, . . . does not assert a grievance against anyone, does not seek remedy or redress for any legal injury, and does not even require a 'party' on the other side. It is nothing more than a request for permission to seek review." *Hohn* v. *United States,* 524 U. S. 236, 256 (1998) (SCALIA, J., dissenting).

I agree with the majority that the existence of a COA is a jurisdictional prerequisite to the merits appeal. *Ante,* at 336. However, the Court takes a wrong turn when it implies that the merits appeal is part of the habeas process (or "proceeding") but the COA determination somehow is not. Overwhelming authority (including the majority opinion) confirms that § 2254(e)(1) applies to the merits appeal. See *ante,* at 342; *Weaver* v. *Bowersox,* 241 F. 3d 1024, 1030 (CA8 2001); *Putman* v. *Head,* 268 F. 3d 1223, 1241 (CA11 2001); *Johnson* v. *Gibson,* 254 F. 3d 1155, 1160 (CA10 2001); *Francis S.* v. *Stone,* 221 F. 3d 100, 114–115 (CA2 2000); *Weeks* v. *Snyder,* 219 F. 3d 245, 258 (CA3 2000); *Mueller* v. *Angelone,* 181 F. 3d 557, 575 (CA4 1999); *Ashford* v. *Gilmore,* 167 F. 3d 1130, 1131 (CA7 1999); cf. *Sumner* v. *Mata,* 449 U. S. 539, 546–547 (1981) (pre-Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) factual deference provision with virtually identical language applies to merits appeal). The COA determination should be treated no differently, because § 2254(e)(1) draws no distinction between the merits appeal and the COA. The Court's silent conclusion to the contrary is simply illogical. The COA's status as the jurisdictional prerequisite for the merits appeal requires that *both* the COA determination *and* the merits appeal be considered a part of the same "proceeding."

The Court's rejection of this conclusion also conflicts with pre-AEDPA practice. Prior to AEDPA, access to a merits appeal in federal habeas corpus proceedings was governed by a mechanism similar to the COA, known as a certificate of probable cause, or CPC. See *Slack, supra,* at 480. There was also a standard of factual deference similar to, though weaker than, the standard in § 2254(e)(1). See 28 U. S. C. § 2254(d) (1994 ed.).[1] Under these provisions (indis-

---

[1] The pre-AEDPA standard of factual deference provided:

"In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual

tinguishable from AEDPA's for these purposes), courts concluded that § 2254(e)(1)'s predecessor applied directly to the CPC proceeding, without any filtering through the "debatability" standard the Court has used in both the CPC and COA contexts. See, e. g., *Barnard* v. *Collins*, 13 F. 3d 871, 876–877 (CA5 1994); *Cordova* v. *Collins*, 953 F. 2d 167, 169 (CA5 1992). These cases support the straightforward notion that § 2254(e)(1), like its predecessor did with respect to CPC proceedings, applies directly to the COA proceeding.

The Court's decision in *Hohn, supra,* which holds that the COA determination constitutes a "case" in the court of appeals for purposes of this Court's jurisdiction under 28 U. S. C. § 1254, is not to the contrary. *Hohn* does not hold, nor does its logic require, that the COA determination be regarded as separate from the rest of the habeas proceeding. In fact, *Hohn* rejected the proposition that "a request to proceed before a court of appeals should be regarded as a threshold inquiry *separate from the merits* . . . ." 524 U. S., at 246 (emphasis added). Indeed, *Hohn* analogized the COA to the filing of a notice of appeal, *id.,* at 247, which in the civil context all would consider to be part of the same "proceeding" ("instituted by" a complaint) as the trial and merits appeal.

## B

The Court also errs, albeit in dicta, when it implies that delayed state factfinding—here the two years between *voir dire* and the post-trial *Batson* hearing[2]—is an excuse for

---

issue, made by a State court of competent jurisdiction . . . shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit [enumerated exceptions omitted]. . . . And in an evidentiary hearing . . . the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous."

[2] Not all the factfinding was so hindered. Prosecutors gave reasons for 2 of the 10 strikes of black veniremen at the post-trial *Batson* hearing. One of those, Joe Warren, is at issue here. App. 856–860.

weakened factual deference. *Ante,* at 342–343. Even putting aside the fact that an appellate court on direct review should (and would) still give heavy deference to 2-year-old credibility findings,[3] this reasoning is in tension with the plain text of § 2254(e)(1) and ignores changes wrought by AEDPA to the role of federal courts on collateral review.

Unlike an appellate court's review of district court findings of fact for clear error, § 2254(e)(1) establishes a presumption of correctness. It requires that the federal habeas court assume the state court that entered the findings was the best placed factfinder with the most complete record and *only then* ask whether the petitioner can refute that factual finding by clear and convincing evidence. Procedural imperfections ordinarily will not affect this presumption; thus, it does not matter whether the state judge made his decision two years late or with a less-than-perfect record. Admittedly these conditions might increase the *odds* that a habeas applicant could locate helpful evidence, but to "presume" facts "correct" means a court cannot allow a habeas applicant to evade § 2254(e)(1) by attacking the process employed by the state *factfinder* rather than the actual *factfindings.*

This reading is confirmed by the changes worked by AEDPA. Section 2254(e)(1) does not, as its predecessor did, create exceptions to factual deference for procedural infirmities. For example, prior to AEDPA, a federal habeas court

---

[3] I am puzzled by the majority's willingness to hold against *respondent* the failure of prosecutors to testify at the post-trial *Batson* hearing. *Petitioner* could easily have requested that the reasons for the allegedly unconstitutional peremptory strikes be given again, and did not. The attorney representing the State at the post-trial *Batson* hearing made certain that both trial prosecutors were present to reiterate the reasons they gave in the record for striking the challenged black veniremen. App. 865. Petitioner's counsel explicitly refused the opportunity to do so when it was offered. *Ibid.* Furthermore, I fail to understand why a move that resulted in a more efficient hearing without redundant testimony should redound to the benefit of petitioner, who bears the burden of proof in this federal habeas corpus proceeding.

would not defer to state-court determinations of fact if "the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing," 28 U. S. C. § 2254(d)(2) (1994 ed.), "the material facts were not adequately developed at the State court hearing," § 2254(d)(3), or "the applicant did not receive a full, fair, and adequate hearing," § 2254(d)(6). The removal of these exceptions forecloses the use of marginal procedural complaints—such as a delay between *voir dire* and a *Batson* hearing—to determine whether or "how much" a federal habeas court will defer to state-court factfinding.

Section 2254(e)(1) simply cannot be read to contain an implied sliding scale of deference. I do not understand the Court to disagree with this view, however, as its dicta does not actually purport to interpret the text of § 2254(e)(1).[4]

## II

Because § 2254(e)(1) supplies the governing legal standard, petitioner must provide "clear and convincing" evidence of purposeful discrimination in order to obtain a COA. Petitioner's constitutional claim under *Batson* turns on this fact and "reasonable jurists could debate," *ante*, at 336 (internal

---

[4] I do, however, agree with the majority that the Court's decisions in *Hernandez* v. *New York*, 500 U. S. 352 (1991), and *Purkett* v. *Elem*, 514 U. S. 765 (1995) *(per curiam)*, can be helpful in guiding a federal habeas court deciding a claim under *Batson* v. *Kentucky*, 476 U. S. 79 (1986). For instance, both cases confirm that *Batson* step three turns on an evaluation of the prosecutor's proffered race-neutral justifications for the peremptory challenges at issue. *Purkett, supra,* at 768–769; *Hernandez,* 500 U. S., at 364–365 (plurality opinion); *id.,* at 372 (O'CONNOR, J., concurring in judgment); see also *Batson, supra,* at 98, n. 21. Additionally, because *Hernandez*'s clear-error standard is less demanding of a criminal defendant than § 2254(e)(1) is of a habeas applicant, a federal habeas court can deny relief on § 2254(e)(1) grounds if it determines it would do so when reviewing the same facts for clear error. Cf. *Marshall* v. *Lonberger,* 459 U. S. 422, 434–435 (1983) ("We greatly doubt that Congress . . . intended to authorize broader federal review of state court credibility determinations than are authorized in appeals within the federal system itself").

quotation marks omitted), whether a *Batson* violation occurred only if petitioner first meets his burden under § 2254(e)(1). And the simple truth is that petitioner has not presented anything remotely resembling "clear and convincing" evidence of purposeful discrimination.

A

The evidence amassed by petitioner can be grouped into four categories: (1) evidence of historical discrimination by the Dallas District Attorney's office in the selection of juries; (2) the use of the "jury shuffle" tactic by the prosecution; (3) the alleged similarity between white veniremen who were not struck by the prosecution and six blacks who were: Edwin Rand, Wayman Kennedy, Roderick Bozeman, Billy Jean Fields, Joe Warren, and Carroll Boggess; and (4) evidence of so-called disparate questioning with respect to veniremen's views on the death penalty and their ability to impose the minimum punishment.

The "historical" evidence is entirely circumstantial, so much so that the majority can only bring itself to say it "casts doubt on the State's claim that [discriminatory] practices had been discontinued before petitioner's trial." *Ante,* at 335. And the evidence that the prosecution used jury shuffles no more proves intentional discrimination than it forces petitioner to admit that he sought to eliminate whites from the jury, given that he employed the tactic even more than the prosecution did.[5] Ultimately, these two categories of evidence do very little for petitioner, because they do not address the genuineness of prosecutors' proffered race-neutral reasons for making the peremptory strikes of these particular jurors.

In short, the reasons that JUSTICE SCALIA finds this to be a "close case," *ante,* at 348 (concurring opinion), are reasons that, under the correct reading of § 2254(e)(1), it is a *losing*

---

[5] Petitioner shuffled the jury five times; the prosecution did so only three times. Brief for Respondent 21.

case. I write further to explore two arguments advanced by petitioner that the Court deemed helpful in establishing petitioner's "debatable" entitlement to relief, apparently because the majority's "debatability" inquiry requires a less-thorough review of the record and a more permissive attitude toward a COA movant's representations.

## B

As noted, petitioner argues the prosecution struck six blacks—Rand, Kennedy, Bozeman, Fields, Warren, and Boggess—who were similarly situated to unstruck whites. I see no need to repeat JUSTICE SCALIA's dissection of petitioner's tales of white veniremen as ambivalent about the death penalty as Kennedy, Bozeman, Warren, and Boggess. *Ante*, at 350–353 (concurring opinion). However, the majority's cursory remark that "three of the State's proffered race-neutral rationales for striking [black] jurors pertained *just as well to some white jurors who were not challenged and who did serve on the jury*," *ante*, at 343 (emphasis added), is flatly incorrect and deserves some discussion.

For the three challenged peremptory strikes used on Fields, Warren, and Boggess, petitioner has not even correctly alleged the existence of "similarly situated" white veniremen. The majority's discussion of this subject is misleading, stating that "prosecutors explained that their peremptory challenges against six [black] potential jurors were based on ambivalence about the death penalty; hesitancy to vote to execute defendants capable of being rehabilitated; and the [veniremens'] own family history of criminality." *Ibid.* The implication is that for each of the six challenged veniremen, the prosecution gave all three reasons as justifications for the use of a peremptory strike. To clarify: Rand, Kennedy, Bozeman, Warren, and Boggess were struck for ambivalence about the death penalty. Fields, Warren, and Boggess were struck for having family mem-

bers with criminal histories. Bozeman and Fields were struck for making prodefense remarks about rehabilitation.

Simple deduction, and an analysis of petitioner's contentions that includes the *names* of these allegedly similar white veniremen, cf. *ibid.*, reveals that petitioner has unearthed no white venireman who, like Warren and Boggess, was *both* ambivalent about the death penalty *and* related to individuals who had previous brushes with the law.[6] Petitioner also produces no white venireman who, like Fields, expressed prodefense views on rehabilitation *and* had a family member with a criminal history.[7] "Similarly situated"

---

[6] Petitioner directs the Court to white veniremen Noad Vickery, Cheryl Davis, Chatta Nix, and Joan Weiner as having family members with criminal histories, but points to white veniremen Sandra Hearn and Marie Mazza as equally ambivalent about the death penalty. Brief for Petitioner 22. Of course, as JUSTICE SCALIA demonstrates, Hearn and Mazza were *not* ambivalent about the death penalty. *Ante,* at 351–352 (concurring opinion).

[7] Again petitioner points to Vickery, Davis, Nix, and Weiner for similar family histories. JUSTICE SCALIA has shown that none of these four were in fact similarly situated to Fields with respect to this justification. *Ante,* at 353–354 (concurring opinion). Petitioner also alleges that Hearn made prodefense remarks about rehabilitation similar to those made by Fields. Again, no white venireman even allegedly fits *both* reasons given for striking Fields. Furthermore, even if Fields had only been struck for his views on rehabilitation, those views were in no way equivalent to those expressed by Hearn. Fields answered "yes" to the question whether he believed that "everyone can be rehabilitated." App. 118. Fields went on to say that "[i]t may be far-fetched, but I feel like, if a person has the opportunity to really be talked about God and he commits himself, whereas he has committed this offense, then if he turns his life around, that is rehabilitation." *Ibid.* In contrast, Hearn stated that she "believe[d] in the death penalty if a criminal cannot be rehabilitated." *Id.,* at 694.

Petitioner tries to muddy the waters by pointing out that Fields was, in other respects, a good State's juror because he supported the death penalty. Brief for Petitioner 24–25. However, that does not change the fact that Fields said that everyone could be rehabilitated (and thus might have been swayed by a penitent defendant's testimony) and Hearn insisted that

does not mean matching any one of several reasons the prosecution gave for striking a potential juror—it means matching *all* of them.

This leaves Rand, Kennedy, and Bozeman.[8] Petitioner alleges that white jurors Hearn and Mazza were as ambivalent about the death penalty as these three struck black veniremen. JUSTICE SCALIA has adequately demonstrated that this is absurd with respect to Kennedy and Bozeman, but I agree that petitioner makes a slightly better case with Rand. *Ante*, at 352–353 (concurring opinion). However, since the burden is on petitioner to show, by *clear and convincing evidence*, that Rand was struck *because of his race*, I find this sliver of evidence, even when combined with petitioner's circumstantial evidence, insufficient to rebut § 2254(e)(1)'s presumption.

## C

Petitioner's accounts of "disparate questioning" also amount to little of substance. Petitioner argues that the prosecution posed different questions at *voir dire* depending on the race of the venireman on two subjects: the death penalty and the minimum punishment allowed under law. Neither accusation can withstand a careful examination of the full record or help petitioner assemble the requisite clear and convincing evidence.

---

some people could not be rehabilitated. In analyzing *Batson* claims the focus should not be on the *"reasonableness* of the asserted nonracial motive . . . [but] rather [on] the *genuineness* of the motive." *Purkett*, 514 U. S., at 769 (emphasis in original).

[8] The prosecution's stated reasons for striking Bozeman were that he was ambivalent about the death penalty and that he made prodefense remarks about rehabilitation. This is one case where the prosecution gave multiple reasons for a strike and petitioner actually correctly *alleged* the existence of a similarly situated white venireman, Hearn. Petitioner believes, albeit erroneously, see *ante*, at 351–353 (SCALIA, J., concurring), that Hearn expressed similar ambivalence about the death penalty *and* made prodefense remarks about rehabilitation.

1

Respondent counters petitioner's complaints about the so-called "graphic formulation" or "script" by arguing that this depiction was used only with those potential jurors who "expressed reservations about the death penalty in their juror questionnaires." Brief for Respondent 17. The majority discounts this explanation, stating that "[t]his cannot be accepted without further inquiry." *Ante,* at 344. Under my view, however, petitioner bears the burden of showing purposeful discrimination by clear and convincing evidence.

The Court's treatment of this issue focuses on the apparent disparity in treatment of 10 black veniremen and 10 white veniremen who were supposedly similar in their opposition to the death penalty. The majority notes that only 2 out of these 10 whites got the graphic description while 7 out of 10 blacks did. *Ante,* at 344–345. But the Court neglects to mention that the eight white veniremen who petitioner thinks should have received the graphic formulation, Reply Brief for Petitioner 15, n. 19, were so emphatically opposed to the death penalty that such a description would have served no purpose in clarifying their position on the issue. No trial lawyer would willingly antagonize a potential juror ardently opposed to the death penalty with an extreme portrait of its implementation. The strategy pursued by the prosecution makes perfect sense: When it was necessary to draw out a venireman's feelings about the death penalty they would use the graphic script, but when it was overkill they would not.

The record demonstrates that six of these eight white veniremen were so opposed to the death penalty that they were stricken for cause without the need for the prosecution to spend a peremptory challenge. For example, John Nelson wrote on his questionnaire, "I believe that the State does not have the right to take anyone's life," Tr. of Voir Dire in No. F85–78668–NL (5th Crim. Dist. Ct., Dallas County, Tex.), p. 625 (hereinafter VDR) (internal quotation marks omitted), and testified flatly, "I would not be able to vote for the death

penalty."[9] *Id.*, at 614. Nelson was struck for cause. *Id.*, at 662–663. Linda Berk was "always" opposed to the death penalty, *id.*, at 1449, and felt so strongly on the subject that the prosecutor remarked upon her discomfort, after which she stated, "[y]ou're going to have to excuse me because I'm getting a little emotional, okay?" *Id.*, at 1445. Later, after she had begun crying, Berk was struck for cause. *Id.*, at 1478. Gene Hinson stated curtly, "I put on the form there that I didn't agree with it," *id.*, at 1648, and was struck for cause. Sheila White said, "I have always been against . . . the death penalty," *id.*, at 2056, and was struck for cause.

Even those two not struck for cause had firm views. Margaret Gibson said: "I don't believe in the death penalty. I don't know why it was started. I don't think it solves anything," *id.*, at 485, and was struck by the prosecution with a peremptory strike. And James Holtz thought the death penalty appropriate only if a policeman or fireman was murdered. *Id.*, at 1021. I can apprehend simply no reason to fault the prosecution for failing to give a more graphic description of lethal injection to prospective jurors with such firm views against capital punishment.

I recognize that these *voir dire* statements only indirectly support respondent's explanation because the graphic script was typically given at the outset of *voir dire*—before the above quoted veniremen had the chance to give their stark answers. Nevertheless, all available evidence supports respondent's view that those who were unclear in their views on the death penalty *in their juror questionnaires* received the graphic formulation—and that those who were adamantly for *or against* the death penalty in their questionnaires did not.

The jury forms at issue asked two questions directly relevant to the death penalty. Question 56 asked, "Do you believe in the death penalty?," offered potential jurors the

---

[9] Nelson was also a doctor and presumably did not need to have the lethal injection process described to him.

chance to circle "yes" or "no," and then asked them *to* "[p]lease explain your answer." See, *e. g.*, Joint Lodging 44 (Boggess questionnaire). Question 58 allowed potential jurors to circle "yes" or "no" in answering the following question: "Do you have any moral, religious, or personal beliefs that would prevent you from returning a verdict which would ultimately result in the execution of another human being?" *Ibid.*

First, as already noted, the deeper and clearer opposition to the death penalty on the part of the eight whites who did not receive the graphic script (but petitioner thinks should have) indirectly supports respondent's contention that this opposition came out in their questionnaires (presumably by an answer of "no" to question 56 and an answer of "yes" to question 58). But this is not the only evidence supporting respondent's view. Hinson, a white venireman who did not receive the graphic formulation, stated during *voir dire* that he "put on the form there that [he] didn't agree with [the death penalty] for both moral and religious reasons." VDR 1648. Similarly, Nelson, a white venireman not receiving the graphic formulation, stated on his questionnaire, "I believe that the State does not have the right to take anyone's life." *Id.*, at 625 (internal quotation marks omitted). Fernando Gutierrez, a juror who received the graphic formulation, answered "yes" to question 56, but also "yes" to question 58, indicating he had "moral, religious, or personal beliefs" that would obstruct his voting for the death penalty despite the fact that he believed in it. Joint Lodging 205.

The prosecution treated the black veniremen no differently. The blacks who did not receive the graphic formulation (whose questionnaires are contained in the record) *all* answered "yes" to question 56, stating they believed in the death penalty, and "no" to question 58, indicating that their beliefs wouldn't prevent them from imposing a death sentence. See *id.*, at 12 (Bozeman), 20 (Fields), 28 (Warren), 36

(Rand). The black veniremen who *were* given the graphic formulation, by contrast, gave ambiguous answers on their juror questionnaires expressing hesitation, rather than philosophical opposition, to the death penalty. Boggess answered "yes" to question 56 but also "yes" to question 58. *Id.*, at 44. Kennedy answered "yes" to question 56 but indicated that he believed in the death penalty "[o]nly in extreme cases, such as multiple murders." *Id.*, at 51. Troy Woods answered "no" to question 56, but also "no" to question 58, indicating he *did not* believe in the death penalty but would have no personal objection to imposing it. *Id.*, at 180. He wrote "that *[sic]* not punishment," in the space provided for question 56. *Ibid.* It happened that, while not completely clear about it in the questionnaire (and hence receiving the graphic formulation), Woods was an enthusiastic supporter of the death penalty, and he was, in fact, seated on petitioner's jury. Further confirming respondent's explanation, black veniremen Linda Baker, Janice Mackey, Paul Bailey, and Anna Keaton all gave unclear responses to questions 56 and 58 and all received the graphic formulation. See Tr. of Pretrial Hearings in No. F85–78660–NL (5th Crim. Dist. Ct., Dallas County, Tex.) (Def. Exh. 7).[10]

---

[10] Questions 56 and 58, and the responses thereto, are found on page 6 of each questionnaire. Baker did not circle "yes" or "no" in answering question 56, but wrote "[m]y strongest feeling is against the death penalty; *however, being aware of the overcrowding in jails and the number of murders[,] I would have to know the facts to make a decision . . . .*" (Emphasis added.) Baker also did not answer question 58, writing "undecided" instead. Mackey answered question 56 "no," indicating she did not believe in the death penalty, and wrote "Thou Shall Not Kill" in the explanation space. She then proceeded to answer question 58 "no" as well. Bailey circled "yes" in answering question 56, but wrote in "NO" with a circle around it, along with such explanations as "yes for a major crime" and "[n]o *one* have *[sic]* the right to take *anothe [sic]* ones *[sic]* life." (Emphases in original.) He then circled "no" in answering question 58. Keaton circled "no," indicating she did not believe in the death penalty, when she answered question 56, writing "It's not for me to pun-

To sum up, the correlation between questionnaire answers and the use of the graphic script is far stronger than any correlation with race. Sixteen veniremen clearly indicated on the questionnaires their feelings on the death penalty,[11] and 15 of them did not receive the graphic script.[12] Eight veniremen gave unclear answers and those eight veniremen got the graphic script.[13] In other words, for 23 out of 24, or 96%, of the veniremen for whom questionnaire information is available, the answers given accurately predict whether they got the graphic script.[14] Petitioner's theory that race determined whether a venireman got the graphic script produces a race-to-script correlation of only 74%—far worse.[15]

### 2

Petitioner fares no better with his allegation that the prosecution employed two different scripts on the basis of

---

ished *[sic]* anyone." However she then circled "no" in answering question 58, indicating that she did not have any objection to imposing the death penalty.

[11] See VDR 1648 (Hinson), 625 (Nelson); Joint Lodging 12 (Bozeman), 20 (Fields), 28 (Warren), 36 (Rand), 125 (Mary Sumrow), 132 (Ronnie Long), 140 (Weiner), 148 (Mazza), 156 (Vivian Sztybel), 164 (Debra McDowell), 172 (Kevin Duke), 189 (Brenda Walsh), 197 (Filemon Zablan), 213 (Hearn).

[12] Sztybel received the graphic script. VDR 2828.

[13] Boggess, Kennedy, Baker, Mackey, Bailey, Keaton, Gutierrez, and Woods.

[14] This analysis considers Hinson and Nelson as being clearly opposed to the death penalty in their questionnaires (answering question 56 "no" and question 58 "yes") and Kennedy as being ambiguous (though in fact he answered question 56 "yes" and 58 "no"). Even without these assumptions, 13 out of 15 veniremen who answered "yes" to question 56 and "no" to question 58—indicating clear support for the death penalty—did not receive the graphic script. And seven out of seven of those answering "no" and "no" or "yes" and "yes"—indicating ambiguous or mixed feelings about the death penalty—or not answering clearly at all received the graphic script. This yields an accuracy rate of 20 out of 22, or 91%.

[15] For whites, 10 out of 12 did not get the graphic script. For blacks, 7 out of 11 did get the graphic script. This means race predicted use of the graphic script only 74% of the time.

race when asking questions about imposition of the minimum sentence. Indeed, this disparate questioning argument is as flawed as the last one. Respondent admits that the different questioning on minimum sentences was used as an effort to get veniremen the prosecution felt to be ambivalent about the death penalty dismissed for cause. In making the decision whether to employ the "manipulative" minimum punishment script, prosecutors could rely on both the questionnaires and substantial *voir dire* testimony, as the minimum punishment questioning occurred much later in *voir dire* than the graphic formulation.

Seven black veniremen were given the allegedly "manipulative" minimum punishment script, all of whom were opposed to the death penalty in varying degrees. Rand, Kennedy, Bozeman, Warren, and Boggess' views on the death penalty have all been exhaustively discussed. This leaves Baker and Fields. Baker's views on the death penalty were so clearly ambivalent that she is not even the subject of petitioner's *Batson* challenge. And Fields' family history of criminality and views on rehabilitation, as earlier discussed, *supra*, at 362, and n. 7, convinced the prosecution to use a peremptory strike.[16] Finally, petitioner's objection to the prosecution's decision not to use the "manipulative" punishment script on Woods, Reply Brief for Petitioner 17, n. 23, makes no sense. Woods gave answers indicating he would be an excellent State's juror—why would the prosecution have tried to eliminate him? Of course, if petitioner were correct that the prosecution sought to eliminate blacks then one might expect that all methods, including the use of the "manipulative" script, would have been deployed against Woods, who happened to also be black.

As with graphic questioning, respondent's explanation goes unrebutted by petitioner. Unless a venireman indicated he would be a poor State's juror (using the criteria that

---

[16] The prosecution in fact used peremptory strikes on all seven of these black veniremen.

respondent has identified here) *and would not otherwise be struck for cause or by agreement,* there was no reason to use the "manipulative" script. Thus, when petitioner points to the "State's failure to use its manipulative method with the vast majority of white veniremembers who expressed reservations about the death penalty," *ibid.,* he ignores the fact that of the 10 whites who expressed opposition to the death penalty, 8 were struck for cause or by agreement, *meaning no "manipulative" script was necessary to get them removed.* The other two whites were both given the "manipulative" script *and* peremptorily struck,[17] just like Rand, Kennedy, Bozeman, Fields, Warren, Boggess, and Baker.

\* \* \*

Quite simply, petitioner's arguments rest on circumstantial evidence and speculation that does not hold up to a thorough review of the record. Far from rebutting § 2254(e)(1)'s presumption, petitioner has perhaps not even demonstrated that reasonable jurists could debate whether he has provided the requisite evidence of purposeful discrimination—but that is the majority's inquiry, not mine. Because petitioner has not demonstrated by clear and convincing evidence that even one of the peremptory strikes at issue was the result of racial discrimination, I would affirm the denial of a COA.

---

[17] See Joint Lodging 110; VDR 502–511 (Gibson), 1046–1050 (Holtz).