United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 17, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**NO. 03-50483**

_____

**TIMOTHY COCKRELL,**

**Petitioner-Appellant,**

**versus**

**DOUGLAS DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,**

**Respondent-Appellee.**

_____

**Appeal from the United States District Court
for the Western District of Texas
SA-99-CA-1119-FB**

_____

Before JONES, STEWART and DENNIS, Circuit Judges.

PER CURIAM:[*]

In July 1993, Timothy Cockrell was convicted of the murder of Sandra Deptawa and was sentenced to death. His conviction and death sentence were upheld by the Texas Court of Criminal Appeals and the Supreme Court denied Cockrell's petition for a writ of certiorari on direct appeal. Cockrell then filed an application for a writ of habeas corpus in state court. The state court filed findings of fact and conclusions of law recommending

_____

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

that Cockrell's application be denied. In September 1999, the Texas Court of Criminal Appeals adopted the state court's recommendation and denied Cockrell's state habeas application. Cockrell then filed a federal petition for a writ of habeas corpus arguing that his trial counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment. The district court denied federal habeas relief and also denied Cockrell's application for a certificate of appealability ("COA"). Cockrell now applies to this court for a COA.

After reviewing the district court's detailed opinion denying habeas relief, we deny Cockrell's application for a certificate of appealability.

## I. BACKGROUND

On August 9, 1992, Sandra Deptawa's half-naked body was discovered submerged in the bathtub of her new home. An autopsy revealed that she had been strangled to death. Her mouth had been bound with a curtain tie and a belt had been tied around her left wrist. Scattered around the house were various items of female clothing including women's underwear. Several items were missing from Deptawa's house, including jewelry, a vacuum cleaner, a television, and a .25 caliber handgun. Deptawa's car, a Mazda RX-7, was also missing. The next day, the police located Sandra's car at a public housing project and apprehended a man who attempted to drive the car away. The driver, Kelly Wright, denied stealing

2

the car and claimed that Timothy Cockrell had brought the car to the housing project. Shannon Haynes, a resident of the housing project, approached police and informed them that Cockrell had in fact brought the car to the housing project and had lent him the car the night before. Haynes then led the police to Cockrell's apartment.

Cockrell was arrested on an outstanding parole warrant and was informed that he was a suspect in a capital murder investigation. After being advised of his Miranda rights, Cockrell spoke with San Antonio Police Detective George Saidler. During the course of his conversation with Detective Saidler, Cockrell confessed to robbing and killing Deptawa. Cockrell explained he had helped move Deptawa into her home on August 7, 1992, as a member of a three-person moving crew, and that he returned to her house two days later intending to steal some of the property he had helped move. Cockrell said he needed the property in order to support his $600-a-day cocaine habit and that he entered Deptawa's house under the pretense of fixing a table that had been broken during the move. Cockrell admitted that he had bound and gagged Deptawa, but he could not remember much of what had happened because he had been high on cocaine at the time and had not slept for three days. After listening to Cockrell's confession, Detective Saidler typed up a three-page statement, read it to Cockrell, and had Cockrell sign each page in the presence of two civilian witnesses.

3

At trial, the defense argued that Cockrell did not murder Sandra Deptawa and attempted to draw the jury's interest to other possible suspects. Highlighting an absence of any evidence at Deptawa's residence that incriminated Cockrell, the defense suggested that the witnesses against Cockrell were lying. The defense also contended that Cockrell's confession was improperly obtained, based on his apparent inability to read, low I.Q. scores, and poor educational record. The defense essentially suggested that Cockrell could not understand the facts contained in his signed confession.

During the course of the trial, Cockrell introduced expert testimony from Dr. Ronnie Alexander that two I.Q. tests given Cockrell in 1973 and 1978 appeared to show him as ranking in the lowest three percent of the population, with scores ranging from 25 to 35 on the verbal components of the tests and 37 to 42 on the performance components. In addition, Dr. Alexander testified that he gave Cockrell a battery of reading tests which reflected that his reading comprehension was in the lowest one percent of the adult population. These factors, combined with Cockrell's poor educational background, led Dr. Alexander to opine that Cockrell could neither understand the confession prepared by Detective Saidler nor communicate effectively enough to have given the statement recorded by Saidler. In Dr. Alexander's view, the confession was not voluntary.

4

On cross-examination, the prosecution extracted concessions from Dr. Alexander that an I.Q. score in the thirties would render Cockrell profoundly mentally retarded, that it was possible that Cockrell could have understood at least part of the statement, and that Cockrell could also have understood a paraphrase of his statement.

After deliberating for less than one full day, the jury returned a guilty verdict. During the punishment phase of the trial, the prosecution introduced evidence regarding Cockrell's lengthy criminal record, which included 13 different first-degree felony convictions over a ten-year period, as well as testimony from two correctional officers who had witnessed Cockrell attacking another inmate with a combination lock tied to a belt. The prosecution also called Dr. John C. Sparks, a licensed psychiatrist, who disputed Dr. Alexander's interpretation of the raw scores on the I.Q. tests given Cockrell in 1973 and 1978. Dr. Sparks indicated that the proper method for interpreting raw I.Q. test scores is to cross-reference the scores with the subject's chronological age, and that doing so with Cockrell's 1970's test scores resulted in a determination that Cockrell had a composite I.Q. somewhere in the mid-70's to mid-80's during that period. In addition, Dr. Sparks noted that the Texas Department of Criminal Justice regularly conducts I.Q. tests on inmates and that Cockrell, while incarcerated for other offenses during the 1980s, had I.Q. test scores of 75, 86 and 93. Dr. Sparks also testified

5

that an individual with an I.Q. score in the thirties would be unable to care for himself and would have been unable to follow the directions that Dr. Alexander had given Cockrell during the reading tests he conducted. In conclusion, Dr. Sparks testified that Cockrell was not mentally retarded.

The jury found, based on the Texas capital murder special issues, that beyond a reasonable doubt, there was a probability that Cockrell would commit criminal acts of violence that would constitute a continuing threat to society, and that taking into consideration all of the evidence, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment. Cockrell was sentenced to death. Following completion of his direct appeal and state habeas proceedings, Cockrell filed a federal habeas petition that was denied in a comprehensive 79-page opinion issued by the district court. When the district court denied a COA, this application followed.

## II. DISCUSSION

In applying for this COA, Cockrell argues that particular decisions by his two attorneys at trial rendered their assistance ineffective in violation of the Sixth Amendment. First, Cockrell asserts that his trial counsel should have presented evidence at the punishment phase of his then-current I.Q. and should have presented testimony to rebut Dr. Sparks's testimony regarding the proper methodology for determining an individual's I.Q. In

6

addition, Cockrell argues that his trial counsel should have presented punishment phase evidence that Cockrell's actions were the result of "cocaine psychosis."

## A. Standard for the Issuance of a Certificate of Appealability

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the Supreme Court has held that a state prisoner has "no absolute entitlement to appeal a district court's denial" of a petition for a writ of habeas corpus. See Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). Before a habeas appeal may be entertained, a prisoner who is denied habeas relief by the district court must first obtain a COA from a circuit judge. See id.; 28 U.S.C. § 2253(c)(1) (2000 & Supp. 2003) ("Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals."). The COA determination requires the court of appeals to undertake "an overview of the claims in the habeas petition and [make] a general assessment of their merits." Miller-El, 537 U.S. at 336. However, in making this threshold inquiry, the Supreme Court noted that AEDPA specifically bars the courts of appeals from undertaking "full consideration of the factual or legal basis adduced in support of the claims." See id. Under the Supreme Court's reading of AEDPA, to fully adjudicate the merits of a habeas petition in denying a COA would be to decide an appeal without jurisdiction. See id. at 336-37.

7

In order to obtain a COA under AEDPA, a federal habeas petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2000 & Supp. 2003). This standard is only satisfied when a petitioner demonstrates that "jurists of reason could disagree with the district court's resolution of the constitutional claims or that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further." See Miller-El, 537 U.S. at 327.

Because our review demonstrates that no reasonable jurist could disagree with the district court's well-reasoned resolution of Cockrell's ineffective assistance claims and because no jurist could conclude that these claims deserve encouragement to proceed, we deny Cockrell's petition for a COA.

## B.   Analysis of the District Court's Decision

To prevail on the type of ineffective assistance claims Cockrell has made, Cockrell must show that his attorneys "failed to investigate or introduce [the] evidence; that this failure amounted to deficient performance by his attorneys; and that he was prejudiced by this failure." See Johnson v. Cockrell, 306 F.3d 249, 251-52 (5th Cir. 2002) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). Moreover, under the restrictions of AEDPA, federal courts must defer to a decision of state courts unless the decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law," as determined by

8

the Supreme Court, 28 U.S.C. § 2254(d)(1), or involved "an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." 28 U.S.C. § 2254(d)(2).

The district court noted that Cockrell offered no evidence during the state habeas proceeding suggesting what an I.Q. test performed near the time of Cockrell's trial would have revealed. Nor did Cockrell present any evidence regarding what a rebuttal expert called to discuss Dr. Sparks's testimony might have offered. As a result, the district court concluded that Cockrell failed to show that the state courts unreasonably applied the deficient performance and prejudice prongs of the <u>Strickland</u> test. We agree.

Even assuming, <u>arquendo</u>, that Cockrell could show that his trial counsels' failure to contact experts concerning (a) his I.Q. at the time of trial and (b) potential errors in Dr. Sparks's testimony amounted to inadequate investigation and deficient performance, Cockrell did not present even a scintilla of evidence as to how these failures prejudiced his defense. <u>See</u>, <u>e.g.</u>, <u>Moawad v. Anderson</u>, 143 F.3d 942, 948 (5th Cir. 1998) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.") (internal quotation marks and citations omitted); <u>Andrews v. Collins</u>, 21 F.3d 612, 624 (5th Cir. 1994) (to satisfy the prejudice prong of <u>Strickland</u>, the defendant must "show evidence of sufficient quality

9

and force to raise a reasonable probability that, had it been presented to the jury," a different outcome would have resulted).

Cockrell admits as much in his reply brief before this court. Noting that his state habeas counsel had never done capital work before this case, Cockrell acknowledges that his state habeas petition contained no evidence outside the trial record and that "no experts were called by the state habeas counsel to substantiate the claims raised in the state writ especially regarding the failure by trial counsel to produce mitigation evidence on mental retardation, IQ and cocaine-induced behavior." As petitioner, Cockrell bore the burden to prove that the state court's decision, based on the evidence before it, was an unreasonable application of governing constitutional law or of the law to the facts. He did not carry his burden.

Cockrell's argument regarding the potential effect of expert testimony regarding the "cocaine psychosis" theory suffers from similar problems. While Cockrell's state habeas attorney submitted a series of articles regarding "cocaine psychosis" and argued that expert testimony might have assisted the jury, he offered no evidence that Cockrell suffered from such a disease. Evidence of the existence of such a disease, unaccompanied by evidence of the relevance of the disease to the case at hand, cannot support a contention that Cockrell's trial counsel rendered ineffective assistance. Finally, Cockrell did not suggest how the outcome of his case was prejudiced by the failure to contend that

10

he murdered Deptawa while allegedly suffering from cocaine psychosis.

Apart from the merits of the argument, as both the state habeas court and the federal district court noted, Cockrell's trial attorneys testified at the state habeas proceeding that they had legitimate, objectively reasonable, strategic reasons for not presenting potentially double-edged evidence regarding Cockrell's alleged history of cocaine abuse. See Kitchens v. Johnson, 190 F.3d 698, 701-03 (5th Cir. 1999) (trial counsels' decision not to offer evidence related to the defendant's forced consumption of alcohol during an abusive childhood did not constitute ineffective assistance because the evidence raised the issue of prior drug use by the defendant); Johnson, 306 F.3d at 253 (noting that "so long as the decision not to introduce double-edged mitigation evidence was based on trial strategy rather than lack of investigation, those questions are even less susceptible to judicial second-guessing") (internal quotation marks and citations omitted). Given Cockrell's lengthy criminal history and his contention throughout the trial that he did not commit the crime, we agree with the district court's determination that the state courts did not unreasonably conclude that Cockrell's trial counsels' decision not to highlight his past drug use was the product of reasonable strategy rather than the lack of adequate investigation.

## III.  CONCLUSION

11

For the reasons discussed above, Cockrell's application for a certificate of appealability raises no issues that are reasonably debatable among jurists after <u>Miller-El</u> and must be **DENIED.**