IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 14, 2008

Charles R. Fulbruge III
Clerk

No. 07-70005

DERRICK LEON JACKSON

Petitioner-Appellant

v.

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent-Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:05-CV-4083

Before JOLLY, DENNIS, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Petitioner, Derrick Leon Jackson, requests a certificate of appealability
("COA"). His request is DENIED.

## I. FACTS AND PROCEEDINGS

Jackson, a prisoner sentenced to death and currently in the custody of the
Texas Department of Criminal Justice ("TDCJ"), filed this application for a COA
after his petition for a writ of habeas corpus was denied by the district court.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

The victims, Forrest Henderson and Richard Wrotenberry, were singers in the Houston Grand Opera. Wrotenberry moved into Henderson's Houston apartment to housesit while Henderson was out of the country and continued to live in the apartment after Henderson had returned.

David Trujillo lived next door to Henderson and Wrotenberry. At approximately 10:30 p.m. on Saturday, September 10, 1988, Trujillo heard music and Henderson's voice through the common wall separating their apartments. Trujillo went to sleep around 2:00 a.m. and was awakened at 4:45 a.m. by the sound of Wrotenberry screaming several times, "Oh my God. No. No." Trujillo also heard what sounded like someone being hit numerous times with a pipe or a baseball bat. After thirty minutes of silence, he heard the water running for about forty-five minutes. Trujillo never heard Henderson's front door open or anyone leave, but a person could enter or leave Henderson's apartment via a separate stairwell without passing by Trujillo's door.

Trujillo testified that he often saw "street trash" entering and leaving Henderson's apartment before Wrotenberry moved in, that the apartment was a rowdy place, and that screaming and fighting were common there. The rowdiness subsided after Wrotenberry moved in.

Wrotenberry was a music teacher at Deer Park Elementary School, and on Monday, September 12, 1988, he failed to appear for work. At 9:00 a.m., the school principal contacted Henderson's apartment manager and requested that he check on Wrotenberry. The manager unlocked Henderson's apartment door and found a body covered in blood in one of the bedrooms. He left and called the police.

Police officers arrived at the apartment soon thereafter and detected no sign of forced entry. They found Henderson's and Wrotenberry's bodies in their respective bedrooms at opposite ends of the apartment. Henderson's nude body was lying face-down in his bed, and Wrotenberry's body, clad only in a pair of

swimming trunks, was lying on the floor of his bedroom. The absence of significant blood in the hallway connecting the two bedrooms indicated that neither victim left his room during or after the attacks. Police found a bloody metal bar in the hallway in front of the bathroom door and a bloody knife in the kitchen sink. Blood was on the bedroom walls, doors, and curtains. Both victims' wallets were missing, and Henderson's car was gone. Two or three days later, the car was recovered. Following a chase after a burglary at a mall, the car crashed and caught on fire. The driver was not apprehended, and the police recovered no evidence related to the murders from the car.

A forensic pathologist testified that Henderson received a shallow non-fatal cut to the neck, defensive wounds on both arms, a six-inch fracture of the skull from blunt force, and multiple stab wounds to the torso. Wrotenberry suffered a severed carotid artery, cuts to the vertebrae, and at least three blows to the back of the head with a narrow blunt instrument, such as a pipe. Fixed lividity in both bodies signified that the victims were dead for more than eight hours before they were found. Tests performed on both victims revealed no signs of drugs, alcohol, or semen. Blood samples and twenty identifiable fingerprints were collected from the crime scene, but the Houston Police Department ("HPD") was unable to identify a suspect.

In 1995, nearly seven years after the murders, HPD upgraded to a new fingerprint system with an expanded database. The new system matched Jackson with prints lifted from a beer can and a glass tumbler in Henderson's bedroom. Blood spattered during the attack covered Jackson's fingerprints on the front of the tumbler. A bloody print found on Henderson's bedroom door also matched Jackson's fingerprint. An expert in blood-spatter interpretation testified that the bloody fingerprint could have been formed only by touching a blood drop while the blood was still wet, and could not have been the result of a blood drop landing on an old fingerprint.

Police found only one blood sample in the apartment capable of yielding blood type information. That sample was taken from blood on one of the bedroom doors which an HPD serologist testified was type-B blood. Jackson had type-B blood, and both victims had type-A blood.

A state DNA expert, Mary Henry, testified that Jackson's DNA type matched DNA isolated from blood stains on a red towel and a beige towel located in Henderson's bathroom. That expert testified that Jackson's DNA type for that specific test conducted on the samples from the two towels would occur once out of every 224 people in the black population.[1]

A second DNA expert, Joseph Chu, testified that he conducted a different kind of DNA test on the DNA extracted from the beige towel. He concluded that the DNA from the beige towel came from a single source and matched Jackson's DNA type for that test. By comparing Jackson's DNA type to databases of the black population and using calculation methods approved at the time of the DNA testing in March 1997, Chu calculated that the odds that another black person would possess the DNA profile found on the beige towel were one out of 7.2 million. By the time of Jackson's trial in March 1998, the DNA forensic community had endorsed making a calculation based on combining the probabilities from the two different types of DNA tests that Chu and Henry had conducted. Using that calculation method, Chu testified that the probability of Jackson's DNA type appearing in the black population would be one out of 1.6 billion. He testified that he had compared Jackson's DNA type to the databases for the black population because his race was already known. On cross-examination, Chu testified that had he compared Jackson's DNA type to databases of other races, he would have found similar results.

---

[1] Jackson was black, Wrotenberry was white, and Henderson was black.

Chu also testified that he conducted DNA tests on blood on the metal bar found in the apartment. The tests showed a mixture of DNA from different people on the metal bar. He compared Henderson's and Jackson's DNA, and Wrotenberry's parent's DNA—a DNA type could not be determined from Allen Wrotenberry's sample—to the mixture of DNA on the bar and could not eliminate any of their DNA from the mixture. The tests concluded that the mixture was consistent with all three individuals' DNA. However, Chu could not determine an exact match of the DNA because of the mixture, nor could he provide a mathematical calculation as to the probability of each individual's DNA being in the mixture.

After considering this evidence, the jury found Jackson guilty of capital murder.

During the penalty phase, the state presented evidence that Jackson snatched a woman's purse in 1990. The state also presented evidence that, in 1992, Jackson robbed two other victims of their purses at gunpoint and attempted to steal a car. For those robberies, he received a sentence of ten years which was imposed on May 13, 1992.

Wrotenberry's father testified that Wrotenberry was a vivacious young man. He played tennis and ping pong and was a fan of the Houston Astros and Rockets. Wrotenberry was divorced and had a one year-old daughter at the time of his death. Wrotenberry had a close relationship with his father, mother, and sister. His father testified that he and his family had difficulty coming to grips with Wrotenberry's death and had undergone counseling. Wrotenberry's sister was admitted to a psychiatric hospital following the murder.

Leroy Smith testified for Jackson. Smith was a barber instructor for the TDCJ. Jackson was Smith's student and had completed over 1400 of the 1500 hours required for a barber training course at the time he was brought back to Houston for his capital murder trial. Smith testified that Jackson was a good

student who caused no problems and was respectful of TDCJ personnel and other inmates. Smith never saw Jackson act violently or misuse any of the barber equipment.

Dr. Ann Carolyn Wheeler, a clinical psychologist, also testified for Jackson. She performed a psychological evaluation of Jackson. She testified that Jackson did well in a structured setting, such as prison. He was unlikely to affiliate with a gang or engage in violence in prison. On cross-examination, Dr. Wheeler conceded that Jackson's history of criminal conduct suggested that he was dangerous.

Jackson's mother, Rita Everline, testified that Jackson never knew his father because his father committed suicide when he was a baby. Everline remarried when Jackson was nine months old. Jackson has two younger half-brothers. He was a normal child and got along well with his brothers. Jackson's stepfather had a drinking problem. Sometimes, he and Everline fought, and she fled the house. Jackson did not have any unusual discipline problems at school. Jackson's stepfather's testimony agreed with Everline's testimony.

The jury found that Jackson deliberately committed acts that caused Wrotenberry's death with the reasonable expectation that the death of Wrotenberry or another would result, that there was a probability that Jackson would commit criminal acts of violence that would constitute a continuing threat to society, and that there was not sufficient mitigating evidence to warrant a sentence of life imprisonment rather than death. Accordingly, the jury determined that Jackson be sentenced to death.

The state habeas court found that Jackson's trial counsel interviewed witnesses, talked to his family, and spoke to Jackson about his life and background. The defense counsel contacted everyone that Jackson had requested him to contact for the punishment phase of the trial. In an affidavit, Jackson's trial counsel explained his actions as follows:

During punishment, the jury knew that the defendant had been in prison for 10 years and our main strategy was to establish that he was a good candidate for a life sentence and that he did well in prison. We did not call employees who worked with the defendant at the Luxeford Hotel because the defendant was working there at the time of the offense. Witnesses who knew the defendant during the ten-year period from the offense to the trial would have been in a Catch-22 type of position. If they testified about the defendant's good character, they would be confronted with cross-examination that they didn't know the defendant very well because they did not know that he committed the offense ten years before trial. We presented evidence of the defendant's family background, his good behavior in prison and his psychological profile.

The Texas Court of Criminal Appeals affirmed Jackson's conviction and sentence, Jackson v. State, 17 S.W.3d 664, 677 (Tex. Crim. App. 2000), and denied his application for a writ of habeas corpus. Ex parte Jackson, No. 60,124-01 (Tex. Crim. App. Dec. 1, 2004). Jackson filed a federal petition for habeas corpus on November 30, 2005. The district court granted Quarterman's motion for summary judgment and denied Jackson a COA on February 12, 2007. Jackson v. Quarterman, No. H-05-4083 (S.D. Tex. Feb. 12, 2007).

Jackson raises two issues in this application for a COA. He argues that reasonable jurists could debate whether there was sufficient evidence to support his conviction for capital murder. He also argues that reasonable jurists could debate whether he was denied effective assistance of counsel.

## II. STANDARD OF REVIEW

Jackson filed his federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Accordingly, the petition is subject to AEDPA's requirement that Jackson obtain a COA before an appeal can be taken to this Court. 28 U.S.C. § 2253(c); Miller-El v. Cockrell, 537 U.S. 322, 335–36 (2003). In determining whether a COA should be issued, this Court limits its examination to a "threshold inquiry into the underlying merit of [the petitioner's] claims." Id. at 327. "This threshold inquiry does not require

full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it." Id. at 336. A COA will be granted if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To meet this standard, a petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 336 (internal quotations omitted). The debatability of the underlying constitutional claim is at issue, not the resolution of that debate. Id. at 342.

## III. DISCUSSION

### A. Sufficiency of the evidence

In deciding a sufficiency of the evidence claim, the "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). Jackson claims that reasonable jurists could debate whether there was sufficient evidence to support his conviction for capital murder. He argues that the evidence was constitutionally insufficient to prove his identity as the one who committed the murders and that there was insufficient evidence to prove that both murders were committed during the course of the same transaction. Jackson points to the fact that he was not identified as a suspect until seven years after the crime and that there was no eyewitness, no sign of forced entry, no proof of a prior relationship with the victims, and no proof of a motive. He also states he was not found in possession of any property taken from the murder scene. Jackson relies on Gibson v. Collins, which accepted that where the only evidence is the discovery of the defendant's fingerprints at the scene of the crime, a reasonable juror may find

guilt beyond a reasonable doubt "only if the evidence indicates that the imprinted object was generally inaccessible to the defendant except during the commission of the crime." 947 F.2d 780, 785 (5th Cir. 1991). Jackson also asks this Court to extend Gibson to DNA evidence, specifically the DNA that was found on a towel in the bathroom of the apartment where the murders occurred.

DNA, fingerprint, and blood-type evidence placed Jackson at the apartment both before and immediately after the murders. Jackson's fingerprints were found on a tumbler placed on a stereo speaker in Henderson's room. Blood splatter landed on top of the prints. Jackson's bloody fingerprint was found on Henderson's bedroom door. This print could only have been formed by touching a drop of blood while it was still wet. Therefore, these fingerprints indicate that Jackson was in the apartment both before and soon after the murders. Furthermore, a blood splatter expert testified that the attacker suffered a bleeding wound during the attack. Jackson's DNA was found on bloody towels in the bathroom. Type-B blood, consistent with Jackson's blood, and not consistent with the blood of either victim, was found on a bedroom door. With such evidence, it is not debatable whether any rational trier of fact could have found beyond a reasonable doubt that Jackson's fingerprints and DNA were left at the time of the murders and that Jackson had committed the murders.

Jackson also argues that the evidence was insufficient to show that both murders were committed during the course of the same transaction. This argument is without merit, because of the characteristics of both murders. Both victims suffered cuts to the neck. A bloody knife was found in the kitchen sink. Both victims suffered wounds from blunt force. A bloody metal bar with a mixture of DNA on it was found in the hallway. A neighbor heard what sounded like someone being hit by a pipe or baseball bat in Henderson's apartment. Both murders were committed in that same apartment, separated only by a hallway. Both men's wallets were missing. With such evidence, it is not debatable

whether any rational trier of fact could have found beyond a reasonable doubt that both murders were committed during the course of the same transaction.

## B. Ineffective assistance of counsel

In deciding an ineffective assistance of counsel claim, this Court first determines whether the counsel's performance was deficient. Turner v. Quarterman, 481 F.3d 292, 298 (5th Cir. 2007). "This requires [the defendant to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Second, this Court determines whether the deficient performance prejudiced the defense. Id. "This requires [the defendant to show] that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. In determining whether to grant Jackson's application for a COA, this Court must determine whether reasonable jurists could debate whether Jackson's counsel's performance was deficient, and, if so, whether that performance prejudiced the defense.

Jackson argues that his counsel's performance was deficient in failing to present certain character witnesses at the punishment phase of the trial. He relies on Wiggins v. Smith, 539 U.S. 510, 534 (2003), where the counsel's lack of investigation into the defendant's background "did not reflect reasonable professional judgment." Jackson's reliance on Wiggins is misplaced. In Wiggins, the defense counsel failed to expand the investigation of his client's background beyond social services records and a presentence investigation. Id. at 524. Wiggins's counsel did not have a social history report prepared as was standard practice in Maryland, even though funds were available to have the report made. Id. His performance fell short of the American Bar Association's standards, and the information that he did have about his client's background indicated that additional investigation for mitigating circumstances was necessary. Id.

10

Unlike the counsel in Wiggins, Jackson's counsel made a strategic decision not to seek out the witnesses who knew Jackson before or at the time of the murders. Instead, he chose to rely on witnesses who could testify to Jackson's character while he was in prison, the period just before the trial. He also relied on Jackson's mother and stepfather. The defense counsel reasonably decided that witnesses who knew Jackson between the time of the murders and the trial would lack credibility if they testified to his nonviolent character, in light of the fact that the jury had just convicted Jackson of beating two men with a metal bar and cutting their throats. "This court will not question a counsel's reasonable strategic decisions." Bower v. Quarterman, No. 03-40980, 2007 WL 2326065, at *7 (5th Cir. Aug. 16, 2007). It is not debatable whether Jackson's counsel acted reasonably in deciding not to seek out testimony that Jackson was nonviolent before or at the time of the murders. Therefore, Jackson's application for a COA on the claim of ineffective assistance of counsel is denied.

## IV. CONCLUSION

Jackson's application for a COA is DENIED.