# NO. 12-09-00370-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *AARON LAMON MUSE,*<br>*APPELLANT* | § | *APPEAL FROM THE SEVENTH* |
| *V.* | § | *JUDICIAL DISTRICT COURT OF* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *SMITH COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Aaron Lamon Muse appeals his conviction for aggravated robbery, for which he was sentenced to imprisonment for life and fined $10,000. In two issues, Appellant argues that the trial court erred in denying his challenge to the composition of the jury and that the evidence is factually insufficient to support his conviction. We affirm.

### BACKGROUND

On January 2, 2009, an African American male, armed with a silver handgun, robbed a Family Dollar store in Lindale, Texas. He was wearing a black ski mask, gloves, a black or dark brown leather jacket, a dark colored hooded pullover, dark blue jeans, and dark colored shoes. A short distance away and approximately an hour later, a similarly attired African American male, again armed with a silver handgun, robbed a Super Stop gas station and convenience store in Mineola, Texas. During the robbery of the Super Stop store, the robber fired a shot at a witness to the robbery. Law enforcement immediately believed that the robberies were committed by the same person.

Prior to the Super Stop robbery, a Mineola police officer saw a silver pickup truck parked in an unusual location very near the store. He reported the license plate to dispatch to ensure that

1

the truck had not been reported stolen. After the armed robbery was reported, the officer returned to the location where the truck had been parked. He found that someone had driven the truck away leaving brown marks on the grass and street, which indicated to the officer that the truck had quickly pulled away from the scene. Officers searched the area and found a $100 bill, a $5 bill, two cash trays that they determined were from the Family Dollar store, and a business card from the business adjoining the Family Dollar store.

Using the license plate number that the Mineola police officer had reported to dispatch, the investigating officers identified the owner of the truck as Rolando Gordon, Appellant's stepfather. Officers went to Gordon's home early on the morning of January 3, 2009. They saw the truck and also saw a dark colored jacket and a white plastic bag containing coins inside the truck. Gordon said he owned the truck but that Appellant and Appellant's brother drove it. Appellant's brother was in jail at the time, and the officers concluded that Appellant was the likely suspect for the two robberies.

While visiting with Gordon, the officers saw an African American male in the backyard of Gordon's residence. They attempted to make contact with this individual, but he ran away. The officers chased him, but could not find him.

Believing that Appellant committed both robberies, the officers searched the truck and Gordon's house. In the truck, they found a ski mask, gloves, two black jackets, a bank bag containing bills and coins, a white plastic bag containing coins, a silver handgun, and a bag containing one spent cartridge and several rounds of live ammunition. In or near Appellant's room, they found a ski mask, gloves, dark blue jeans, and dark colored shoes. The officers sent the ski mask, gloves, and the silver handgun found in the truck to a DPS laboratory to be tested for DNA evidence. Appellant's DNA matched specimens taken from all three items. Additional DNA from an unknown donor or donors also was found on the items.

The officers questioned Appellant's girlfriend, Shalandria Dawson. According to Dawson, on the evening of the robberies, Appellant was driving the silver pickup truck owned by Gordon. Dawson told the officers that Appellant was with her until about 8:00 p.m, and that she saw him again about 9:00 p.m. At that time, Appellant drove the truck to Gordon's house and began driving another vehicle, a white Buick. Dawson and Appellant went to eat at a restaurant and drove around together afterward. Early in the morning, they drove by Gordon's house and noticed police officers there. Appellant dropped Dawson off at her apartment and went to see

2

what was happening at the house.  He then returned and told Dawson that he had been chased by the police.

Appellant was charged with aggravated robbery for the robbery of the Family Dollar store.  Following the voir dire examination of prospective jurors, the State used five of its peremptory challenges to strike African American potential jurors.  Appellant, who is African American, made a **Batson**[1] motion complaining of the State's strikes.  After an evidentiary hearing, the trial court denied the motion.

Following the presentation of evidence, the matter was submitted to the jury.  Ultimately, the jury found Appellant "guilty" as charged.  Punishment was submitted to the jury.  After deliberating, the jury assessed Appellant's punishment at imprisonment for life and a fine of $10,000.  The trial court sentenced Appellant accordingly, and this appeal followed.

### BATSON MOTION

In his first issue, Appellant contends that the trial court erred in denying his **Batson** motion.  Specifically, Appellant alleges that the State engaged in purposeful discrimination when it used its peremptory challenges to excuse two African American individuals, Jurors 1 and 19, from the venire.

**Standard of Review and Applicable Law**

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution forbids a party from challenging potential jurors on the basis of their race.  U.S. CONST. amend. XIV; **Batson v. Kentucky**, 476 U.S. 79, 89, 106 S. Ct. 1712, 1719, 90 L. Ed. 2d 69 (1986).  A trial court follows a three step process to evaluate a claim that a litigant has made a peremptory strike based on race.  **Snyder v. Louisiana**, 552 U.S. 472, 476, 128 S. Ct. 1203, 1207, 170 L. Ed. 2d 175 (2008).  First, a defendant must make a prima facie showing that the state has used a peremptory challenge to remove a potential juror on account of race.  **Id.**; **Purkett v. Elem**, 514 U.S. 765, 767, 115 S. Ct. 1769, 1770, 131 L. Ed. 2d 834 (1995).  A defendant may establish a prima facie case solely on evidence concerning the state's exercise of peremptory challenges at trial.  **Batson**, 476 U.S. at 96, 106 S. Ct. at 1723.  He must also show that these facts and any other relevant circumstances raise an inference that the state has excluded potential jurors from the petit jury on account of their race.  **Id.**

---

[1] **Batson v. Kentucky,** 476 U.S. 79, 89, 106 S. Ct. 1712, 1719, 90 L. Ed. 2d 69 (1986).

Once the defendant has made a prima facie showing, the burden shifts to the state to come forward with a race neutral explanation for challenging the jurors. ***Snyder***, 552 U.S. at 476-77, 128 S. Ct. at 1207; ***Batson***, 476 U.S. at 97-98, 106 S. Ct. 1723-24. If the state offers race neutral reasons for the strikes, the burden shifts again to the defendant to show that the state's race neutral explanations for the strikes are contrived or a pretext to conceal a racially discriminatory intent. ***Shuffield v. State***, 189 S.W.3d 782, 785 (Tex. Crim. App. 2006); ***Jasper v. State***, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001). The credibility of the prosecutor who offers race neutral explanations for disparate striking of jurors can be measured by "the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." ***Miller–El v. Cockrell***, 537 U.S. 322, 339, 123 S. Ct. 1029, 1040, 154 L. Ed. 2d 931 (2003).

We will disturb a trial court's ruling on a ***Batson*** motion only if it is "clearly erroneous." ***Snyder***, 552 U.S. at 477; 128 S. Ct. at 1207; ***Guzman v. State***, 85 S.W.3d 242, 254 (Tex. Crim. App. 2002). Generally, a fact finder's decision is clearly erroneous when it leaves an appellate court with a "definite and firm conviction that a mistake has been committed." ***Guzman***, 85 S.W.3d at 254. We review the evidence in the light most favorable to the trial court's ruling and afford great deference to that ruling. ***Jasper***, 61 S.W.3d at 422. Furthermore, a claim that the proffered race neutral reasons for strikes are pretextual presents a question of fact, not law, and the trial court is in the best position to evaluate such claims. ***Watkins v. State***, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 92, 172 L. Ed. 2d 78 (2008); ***Gibson v. State***, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004). The ultimate plausibility of a race neutral explanation is to be considered in the context of whether the defendant has satisfied his burden to show that the strike was the product of the prosecutor's purposeful discrimination. ***Watkins***, 245 S.W.3d at 447.

**Analysis**

At trial, Appellant objected that the State had struck five of the seven African American members of the prospective jury panel. The State then responded that it had legitimate, race neutral reasons for the strikes. The State responded that Juror 1 had a friend who had been investigated for or charged with kidnapping and was not sure if the judicial system had treated the friend fairly. The State struck Juror 8 because her husband is a minister or pastor, and struck Juror 28, a white female, for the same reason. The State struck Juror 11 because her husband

was unemployed, and struck Juror 22, a white female, for the same reason. The State pointed out that Juror 19 had a family member investigated for or charged with attempted murder. Finally, the State struck Juror 31 because she knew Appellant.

After hearing the State's race neutral reasons, Appellant continued his **Batson** challenge as to the State's strikes of Juror 1 and Juror 19, arguing that the State had treated a similarly situated nonminority panel member, Juror 15, differently. The trial court found that the State's strikes were racially neutral and denied Appellant's **Batson** motion.

We examine all relevant factors bearing upon the trial court's decision. First, given the number of African Americans in the jury strike zone, the analysis of the statistical data pertaining to the State's peremptory strikes is questionable, but not too great to attribute merely to happenstance. Second, a comparative juror analysis indicates that seventeen potential jurors had a friend or family member who had been investigated or charged with a crime. Of those, only Jurors 1 and 19 had a friend or family member that had been investigated or charged with a violent crime, respectively, kidnapping and attempted murder. Appellant argued that Juror 15 also had a family member investigated or charged with a violent crime. Juror 15 had a family member charged with "child molesting," but the State argued that such an offense is a sexual crime, not a violent crime. Certainly, with regard to Juror 19, attempted murder is a violent crime that may be similar, in some respects, to aggravated robbery. Whether kidnapping and "child molestation" should be characterized as violent crimes is not as obvious. However, Juror 1 also stated that it was "questionable" whether the judicial system worked fairly. Thus, the State provided valid, nondiscriminatory reasons for treating Jurors 1 and 19 differently from Juror 15.

Third, the record shows that Appellant, and not the State, requested a jury shuffle. Fourth, a review of the State's voir dire examination shows no contrasting voir dire questions posed respectively to minority and nonminority panel members. Fifth, there is no evidence offered in this case to show that, historically, the State systematically excluded African Americans from juries. Sixth, the reasons provided by the State for the strikes are facially race neutral when measured by "how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *See Miller–El*, 537 U.S. at 339, 123 S. Ct. at 1040. Appellant was on trial for an aggravated robbery. It is reasonable for the State to seek to exclude potential jurors who have had friends or family

members arrested for violent crimes, and those where, as was the case with Juror 1, the potential juror believes that a friend who was charged with a crime may not have been treated fairly by the judicial system.

Having reviewed the entire record, we conclude the trial court's decision to deny Appellant's *Batson* motion was not clearly erroneous. The State provided racially neutral explanations for its use of peremptory challenges, and Appellant failed to carry his burden to show that the stated reasons were pretextual. The trial court was in the best position to assess the reasonableness of the State's assertions regarding the strikes. Such an assessment would rely, in large part, on the trial court's credibility determinations. *See Miller–El*, 537 U.S. at 339–40, 123 S. Ct. at 1040–41. Giving, as we must, deference to the trial court's ruling, we do not have a "definite and firm conviction that a mistake has been committed." *Guzman*, 85 S.W.3d at 254. We overrule Appellant's first issue.

<u>EVIDENTIARY SUFFICIENCY</u>

In his second issue, Appellant argues that the evidence is factually insufficient to support the trial court's judgment. Specifically, Appellant contends that the evidence is factually insufficient to support that he, rather than his stepfather or some unknown person, committed the aggravated robbery.

**Standard of Review and Applicable Law**

We initially note that the court of criminal appeals has recently held that there is "no meaningful distinction between the *Jackson v. Virginia*[2] legal sufficiency standard and the *Clewis* factual sufficiency standard and that "the *Jackson v. Virginia* standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *See Brooks v. State*, 323 S.W.3d 893, 895, 912 (Tex. Crim. App. 2010). Consequently, the court of criminal appeals overruled the factual sufficiency standard of review as set forth in *Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996) and its progeny. *See id.*[3]

---

[2] 443 U.S. 307, 315–16, 99 S. Ct. 2781, 2786–87, 61 L. Ed. 2d 560 (1979).

[3] Appellant did not have the benefit of the court of criminal appeals' opinion in *Brooks* at the time he submitted his brief on the issue of factual sufficiency. We construe Appellant's issue liberally in the interest of justice and review the sufficiency of the evidence under the *Jackson* standard. *See, e.g.*, *White v. State*, 50 S.W.3d 31, 40 (Tex. App.–Waco 2001, pet. ref'd).

6

Legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction. *See Jackson*, 443 U.S. at 315–16, 99 S. Ct. at 2786–87; *see also Escobedo v. State*, 6 S.W.3d 1, 6 (Tex. App.–San Antonio 1999, pet. ref'd). The standard for reviewing a legal sufficiency challenge is whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 320, 99 S. Ct. at 2789; *see also Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). The evidence is examined in the light most favorable to the verdict. *See Jackson*, 443 U.S. at 320, 99 S. Ct. at 2789; *Johnson*, 871 S.W.2d at 186. A successful legal sufficiency challenge will result in rendition of an acquittal by the reviewing court. *See Tibbs v. Florida*, 457 U.S. 31, 41–42, 102 S. Ct. 2211, 2217–18, 72 L. Ed. 2d 652 (1982).

In the case at hand, to support Appellant's conviction for aggravated robbery, the State was required to prove that Appellant, in the course of committing theft and with intent to obtain or maintain control of the property, intentionally or knowingly threatened or placed another in fear of imminent bodily injury or death and used or exhibited a deadly weapon. TEX. PENAL CODE § 29.03 (Vernon 2003).

**Analysis**

The evidence at trial shows that on January 2, 2009, shortly after 8:00 p.m. in Lindale, an African American male entered the Family Dollar store wearing a black ski mask, dark jeans, and a dark jacket. He demanded money while wielding a silver revolver. He was approximately 6 feet tall, and weighed between 200 and 250 pounds. Shortly thereafter at approximately 8:40 p.m. on the same night, a Mineola police officer saw the truck that was later determined to be owned by Gordon, Appellant's stepfather. The officer took note of the truck because it was parked at an odd location and reported the license number to dispatch to determine whether it was stolen. The truck was parked near the Super Stop, where a robbery occurred approximately twenty minutes later. Details provided by witnesses and a review of the surveillance videos of the Super Stop robbery matched the description, dress, methodology, and weapon of the robber at the Family Dollar store. Given that the robberies were committed in close temporal and spatial proximity and the description of the suspect in each was similar, the officers believed that the robberies were committed by the same person.

The Mineola officer recalled the truck that was parked near the Super Store around the time of that robbery. The officers went back to that location and near where the truck was seen

parked. There they found cash, the Family Dollar store's cash register drawers, and a business card from the business adjoining the Family Dollar store. Based on this information, the officers decided to visit Gordon's home in Tyler to further investigate. Upon arrival, Gordon's truck, which had been seen earlier near the Super Stop, was parked in front of the home. A dark colored jacket and a clear plastic bag containing coins were observed in plain view inside the truck. During a subsequent search of Gordon's truck, officers found a ski mask, gloves, two black jackets, a gun, a bank bag containing bills and coins, another bag containing coins, and a bag containing one spent cartridge and several live rounds of ammunition. The robber of the Super Stop fired one shot. While the officers were interviewing Gordon, another man located at the residence fled when he saw police. He was not apprehended, however, and the officers could not say whether that person was Appellant. According to his girlfriend, Appellant told her that he ran from the police in the early morning after the robberies. Further, Appellant's girlfriend testified that Appellant was driving Gordon's truck on the evening in question. Finally, Appellant's DNA evidence was determined to be on the ski mask, gloves, and gun found in the truck.

On the other hand, the victims and eyewitnesses to the robbery were unable to positively identify Appellant as the robber. Because of the attire worn by the robber, the witnesses could only describe the robber as an African American male, approximately six feet tall and weighing from 200 to 250 pounds. This broad description matched the physical characteristics of Appellant and Appellant's stepfather. Additionally, another African American male was found walking near the Super Stop convenience store shortly after the robbery. However, the police officers stopped this individual and found no incriminating evidence. Finally, Appellant alleged that his girlfriend and her neighbor used the truck to commit the robberies while Appellant was taking a nap. Appellant further alleged that the police officers placed his DNA on evidence from the robberies to frame Appellant for the crimes.

In considering the evidence, the jury was free to disregard Appellant's allegations. *See Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986). From the remaining evidence, the jury reasonably could have concluded that Appellant was the driver of the pickup truck on the evening of the two robberies, that Appellant had worn the ski mask and gloves found in the truck, and that he had handled the gun found in the truck. The jury also reasonably could have concluded that the driver of the pickup truck on the evening of the robberies was the robber.

8

Having examined the evidence in the light most favorable to the verdict, we conclude that the jury could have determined beyond a reasonable doubt that Appellant committed the aggravated robbery at issue. Therefore, we hold that the evidence is sufficient under the ***Jackson v. Virginia*** standard to support the trial court's judgment. Appellant's second issue is overruled.

### DISPOSITION

Having overruled Appellant's first and second issues, we ***affirm*** the trial court's judgment.

**BRIAN HOYLE**
Justice

Opinion delivered May 31, 2010.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(DO NOT PUBLISH)