# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-70025

TEDDRICK BATISTE,

Petitioner–Appellant,

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent–Appellee.

United States Court of Appeals
Fifth Circuit

**FILED**
July 6, 2018

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:15-CV-1258

Before DENNIS, SOUTHWICK, and HIGGINSON, Circuit Judges.

PER CURIAM:*

Teddrick Batiste was convicted of capital murder in Texas state court and sentenced to death. He sought post-conviction relief, alleging that his state trial counsel rendered ineffective assistance during sentencing. The state habeas court rejected the claim on the merits. Batiste subsequently filed for habeas relief in federal court. The district court, after extensive analysis,

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-70025

denied relief and declined to issue a certificate of appealability (COA).[1] Batiste now applies for a COA from this court. For the reasons given below, we deny his application.

## I

At trial, the State established, based in part on Batiste's confession, that he killed Horace Holliday while trying to steal tire rims from Mr. Holliday's Cadillac. The district court observed that the killing "was particularly brutal and senseless. Batiste repeatedly shot into the victim's car on the freeway to steal the rims from his car. Once they both stopped, Batiste could have stolen the victim's car and left the injured man lying on his stomach bleeding and pleading for his life. Instead, Batiste repeatedly shot him."[2] Further pertinent to this federal habeas matter, the district court quoted the Texas Court of Criminal Appeals' summary of the punishment phase of Batiste's trial:

> During the punishment phase, the State offered evidence that, on March 23, 2009 (a little more than three weeks before killing Horace Holiday), appellant robbed Walter Jones, his wife, Kari, and David McInnis, at the Phat Kat Tats tattoo shop. A little before 11:00 p.m., appellant parked his Buick in front of the Shipley's Donuts shop in the strip center where the tattoo shop was located. Then he and two cohorts marched into the shop, wearing blue bandanas over their faces and carrying semi-automatic pistols. Appellant screamed, "This is a fucking robbery!" Each of the robbers grabbed one of the three adults, and each put a gun to that person's head. Walter Jones, the owner of Phat Kat Tats, noticed that these robbers were well organized and likely had done this before. Kari, very afraid that their five-year-old son might come into the shop from the next room, pleaded with the robbers not to shoot him if he did so. One of the robbers started yelling at her, "Shut up, bitch, I'll kill you, I'll kill you. Shut up." The robbers made them empty out their pockets. Disappointed with the result, the robbers then scooped up two laptops, several cell phones, a digital camera, and three tattoo machines. They ran

---

[1] *Batiste v. Davis*, 2017 WL 4155461 (S.D.Tex. Sept. 19, 2017).
[2] *Id.* at *12.

out of the shop and fled in appellant's Buick. The surveillance camera at the nearby Shipley's Donuts caught appellant, his cohorts, and the Buick, on tape.

Two weeks later—shortly after midnight on April 8, 2009—appellant drove his Buick through the strip-mall center where the Black Widow tattoo parlor was located. He was "casing" it for a robbery. He backed his Buick into a parking slot in front of the shop, and then he and two other men walked into the tattoo parlor. Steve Robbins, the shop's owner, was tattooing Joshua's arm, while two of Joshua's friends—Anthony and Christie—were napping on the couch. Two of the robbers held Anthony and Christie at gunpoint, while the third robber went toward the back where Steve was tattooing Joshua. Appellant and the other two robbers were yelling and "cussing" at everyone, demanding money and wallets. When Steve told the robbers that they had gotten all the money and they should leave because the store had surveillance cameras, appellant turned back to him and said, "What, motherfucker?" and began shooting Steve. Appellant and another robber shot a total of sixteen bullets before they finally fled in appellant's Buick. Steve died.

The State also introduced evidence of appellant's long criminal history, his gang-related activities, and his various acts of violence and intimidation while in jail.

Horace Holiday's mother, Lisa Holiday Harmon, gave the jurors a brief glimpse into her son's life and how he had saved up the money to buy the special rims for his Cadillac just two weeks before his death. She told the jury that, after the murder, Horace's grandmother moved into Horace's old room to be closer to his memory. Horace's grandmother testified that, after Horace's death, the "whole family fell apart."

During his punishment case, appellant called a dean from the University of Houston to testify to the TDCJ inmate classification system and life in prison. He also called a high-school track and football coach who said that appellant was a gifted athlete in middle school, but that he "disappeared" after he got into trouble for car thefts. Appellant's former boss testified that appellant worked at Forge USA for over six months as a helper on the forging

No. 17-70025

crew. He never had any problems with appellant. Appellant's girlfriend, Stephanie Soliz, testified that she and appellant lived together with her two children, one of whom was fathered by appellant. Appellant was "the best" father. Stephanie admitted that they smoked a lot of marijuana at home and that appellant had a second job as a "fence" for stolen property. She was "okay" with appellant selling stolen property, as long as he wasn't doing the stealing himself.

Appellant's younger brother, Kevin Noel, testified that appellant was "a very caring and loving brother." He did not try to get Kevin to commit crimes or join the Crips gang, but Kevin did join the Line Five Piru Bloods gang and has the gang's tattoos. Kevin would pick appellant up from work and bring him back to his apartment where Kevin smoked dope with appellant and Stephanie. Appellant would write him letters from jail suggesting various new gang tattoos and bragging about having sex with a nurse in the infirmary. Appellant also wrote a letter from the jail to a friend telling him that he had broken his hand fighting with "a white guy from the military." When that man had interfered with appellant's phone call, appellant broke his jaw.

Darlene Beard testified that appellant was her "favorite grandson." She took care of him until he was nine years old. After that, she saw him every Thanksgiving, and sometimes on her birthday or Mother's Day. She never saw appellant do anything bad. "I can only tell you about the good things that I know concerning my grandchild." Mrs. Beard said that appellant has a "huge" family and does not have any conflict with any member of that family. Appellant's mother testified that she was barely sixteen when appellant was born, so her mother took care of him while she finished high school. He was a healthy, happy, church-going child without any mental-health or learning problems until he started getting into trouble in middle school. She knew that appellant was sent to TYC for stealing cars, but he never told her about his other crimes, being in a gang, or having gang tattoos.

Appellant testified that he had a happy childhood, but when he was in middle school, he began selling Ritalin because he wanted to make money. After he was caught, he was sent to an alternative school for the rest of eighth grade and half of ninth grade.

4

Appellant said that, after TYC, he committed crimes "just like to keep money in my pocket, keep everything I needed." Appellant stated that he spent some of his money on marijuana for Stephanie and himself, but he didn't commit crimes to get drug money. He said that he really loves his two boys, Kash and Alex, and would guide them and tell them "what's right, what's wrong."

Appellant testified that he could be a positive influence on people in prison, and he would distance himself from the Crips members "and just pick different goals." Appellant stated that he had followed the jail rules "[t]o the best of my ability.... Everytime, it's always mutual combat. It's never been where I just hit somebody. I hit them back." But appellant did admit that, when faced with the choice to show empathy and help Horace Holiday, who was bleeding to death on the concrete, appellant made the choice to shoot him several more times and steal his car.

When appellant was in jail, Stephanie tried to move on with a new boyfriend, Aaron. Appellant wrote rap lyrics about shooting him: "But Aaron ain't crazy, man. That nigga respect my game. He's a target up in my range. Extended clip to his brain." Appellant admitted that his jailhouse rap lyrics could be seen as glorifying capital murder ("I popped and he dropped"), the gangster lifestyle, and violence in general. Appellant agreed that he recruited the gang members for the Phat Kat Tats robbery and told them what to do. He admitted that he was the leader in the Black Widow capital murder as well. And he said that those were not his first robberies.[3]

After considering this evidence, the jury sentenced Batiste to death.

As noted, the Texas Court of Criminal Appeals affirmed Batiste's conviction and sentence. While the direct state court appeal was pending, Batiste filed a state habeas application, which included an ineffective-assistance-of-trial-counsel (IATC) claim asserting that Batiste's trial counsel did not adequately investigate and develop mitigating evidence relating to his hospitalization for bacterial meningitis when he was less than one year old.

---

[3] *Batiste v. State*, No. AP-76600, 2013 WL 2424134 (Tex. Crim. App. June 5, 2013).

## No. 17-70025

The state habeas court considered the claim and recommended that relief be denied. The Texas Court of Criminal Appeals agreed and denied relief without separate analysis.

Batiste subsequently filed a federal habeas petition. The Director of the Criminal Institutions Divisions of the Texas Department of Criminal Justice (Director) moved for summary judgment and the district court granted the motion, and also denied Batiste a COA. Batiste has applied for a COA from this court.

## II

For a state prisoner seeking federal habeas relief, the issuance of a COA is a jurisdictional prerequisite to appellate review.[4] We may issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right,"[5] meaning that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."[6] Stated another way, we are restricted to "ask[ing] 'only if the District Court's decision was debatable;'" if not, a COA may not issue.[7] This standard allows a COA to issue "even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail."[8]

The Supreme Court has cautioned that, at this threshold stage, we are to refrain from "full consideration of the factual or legal bases adduced in support of the claims."[9] Our focus must remain on the limited inquiry as to

---

[4] *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).

[5] 28 U.S.C. § 2253(c)(2).

[6] *Buck v. Davis*, 137 S. Ct. 759, 773 (2017).

[7] *Id.* (quoting *Miller-El*, 537 U.S. at 348).

[8] *Id.* (quoting *Miller-El*, 537 U.S. at 338).

[9] *Id.* (quoting *Miller-El*, 537 U.S. at 336).

whether a COA should issue and avoid the merits of the appeal as a means to justify a denial of a COA.[10] In a capital case, should any doubt remain after this inquiry as to the propriety of a COA, we resolve those doubts in the petitioner's favor.[11]

### III

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), federal habeas relief is available to petitioners "in custody pursuant to the judgment of a State court" on the basis of "any claim that was adjudicated on the merits in State court"[12] when the state proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,"[13] or if the decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[14]

Batiste objects to the state habeas court's resolution of the merits of his IATC claim. To be entitled to relief, he must "show both that his counsel provided deficient assistance and that there was prejudice as a result."[15] This standard is "highly deferential."[16] For trial counsel's performance to be deficient, it must fall below an objective standard of reasonableness such that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[17] There is "a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional

---

[10] *Id.* (quoting *Miller-El*, 537 U.S. at 336-37).

[11] *United States v. Bernard*, 762 F.3d 467, 471 (5th Cir. 2014) (quoting *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005)).

[12] 28 U.S.C. § 2254(d).

[13] *Id.* § 2254(d)(1).

[14] *Id.* § 2254(d)(2).

[15] *Harrington v. Richter*, 562 U.S. 86, 104 (2011).

[16] *Id.* at 105 (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)).

[17] *Id.* at 104 (quoting *Strickland*, 466 U.S. at 687).

assistance."[18]   To establish prejudice, Batiste must do more than "show that the errors had some conceivable effect on the outcome of the proceeding."[19] Rather, he must show "a reasonable probability"—that is, "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[20]   For a COA to issue, jurists of reason must be able to debate whether Batiste established both deficiency and prejudice.[21]

The district court found the state court habeas resolution of this issue to be reasonable, and we agree without reaching the issue of prejudice.  Batiste challenges the finding that he failed to establish that trial counsel performed deficiently by not discovering and then presenting neuropsychological testing that Batiste's meningitis as an infant may have caused "frontal lobe damage that resulted in executive functioning deficits for which Batiste bears no blame."[22]   Batiste acknowledges that trial counsel secured multiple mental health experts, and that the jury heard evidence of his early hospitalization as well as his risk-taking, impulsive and violent behavior during his life, but Batiste nonetheless contends that "trial counsel provided no expert medical testimony or other context for the significance of Batiste's hospitalization as a nine-month-old for bacterial meningitis."[23]

The Supreme Court has observed that "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste,"[24] and "when a defendant has given counsel reason to believe that

---

[18] *Id.* (quoting *Strickland*, 466 U.S. at 689).
[19] *Id.* (quoting *Strickland*, 466 U.S. at 693).
[20] *Strickland*, 466 U.S. at 694.
[21] *See Buck v. Davis*, 137 S. Ct. at 773.
[22] Application, at 27.
[23] *Id.* at 26-27.
[24] *Id.*

pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."[25]  Here, the state habeas court considered affidavits from both trial counsel[26] and also Batiste's expert, Dr. Underhill,[27] pertaining to the issue

---

[25] *Strickland v. Washington*, 466 U.S. at 691.  Batiste's further reliance on the Supreme Court's ineffectiveness ruling in *Rompilla v. Beard*, 545 U.S. 374 (2005), is unavailing. The Supreme Court in *Rompilla* required "reasonable efforts to obtain and review material counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." 545 U.S. at 377; *see Escamilla v. Stephens*, 749 F.3d 380, 389 (5th Cir. 2014).  The directive in *Rompilla* did not set a particular level of investigation in every case--"reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste," *Rompilla*, 545 U.S. at 383—and, regardless, Batiste identifies no aggravation evidence offered by Texas that counsel did not obtain prior to the sentencing.  *See also Timberlake v. Davis*, 418 F.3d 702 (7th Cir. 2005). Indeed, *Rompilla* is further distinguishable because, there, in view of the prosecution's forewarning, trial counsel had a duty to investigate the file readily available at the courthouse in preparation for the sentencing hearing and for possible leads to mitigation evidence.  545 U.S. at 383–886.  The Supreme Court explained that counsel did not "look at any part of that file, including the transcript, until warned by the prosecution a second time."  *Id.* at 384. Had counsel looked, he would have discovered "a range of mitigation leads that no other source had opened up." *Id.* at 390. Comparison of Batiste's case with *Rompilla* indicates that the state habeas court did not unreasonably apply *Strickland*'s deficiency prong by concluding that Batiste's trial counsel performed an adequate mitigation investigation.

[26] Defense counsel's habeas affidavit, asserting *inter alia* that "I have been trying death penalty cases since 1976 and have tried quite a few and have tried them from both sides of the table….  One of the realities of death penalty litigation that all experienced defense attorneys will admit is this: if you use mental health evidence, short of proving actual insanity, you run the risk of making the defendant look even more dangerous to the jury, and frankly it is generally true, because they are more dangerous….  We had no information from any source, be it a family member, friend, our experts or investigators, or any record that would indicate a frontal lobe disorder, or any mental disorder. He was sharp and I personally saw him make decisions. I am very careful not to call witnesses, especially experts, who on cross examination can destroy our case."

[27] Affidavit of James Underhill, asserting *inter alia* that "Mr. Batiste's frontal lobe functioning with regard to risk taking is impaired….  Mr. Batiste's brain impairment renders him unlikely to stop risky behavior once it has begun, and in fact, causes him to behave in a way that actually increases the risk associated with a given situation despite being aware of the costs….  There are several possible etiologies of the brain dysfunction that Teddrick Batiste demonstrates on neuropsychological testing.  The impairment can result from head trauma or illness…[and] contributing factors…could have been the result of a lack of pre-natal care his mother received during her pregnancy and/or her diet while pregnant. Furthermore, the meningitis Mr. Batiste was reported to have suffered from as [sic] a neonate could have contributed to or been the direct cause of Mr. Batiste's impairment."

of meningitis frontal lobe damage, and then credited the former that "counsel had no information from any expert, investigator, record, family member, or friend indicating that the applicant had any indicia of frontal lobe disorder," and discredited the latter as to the inference that such damage caused Batiste's "risk taking behavior." Furthermore, the state habeas court noted that evidence of impulsivity and poor cognitive function was presented yet also that other evidence disproved that Batiste was unable to control his behavior.

We agree with the district court that reasonable jurists could not debate whether the state habeas court was unreasonable in finding that trial counsel lacked reason to investigate further and develop that Batiste's cognitive deficit may have been caused by frontal lobe damage due to meningitis in infancy. None of trial counsel's three mental health experts identified this as necessary neuropsychological mitigation inquiry, even though two experts extensively interviewed Batiste.[28] Additionally, as the state habeas court observed and the district court elaborated, Dr. Underhill's affidavit supporting Batiste's habeas contention was vague and inconsistent in its suggestion that Batiste's risky behavior traced to the meningitis he was treated for.

## Conclusion

On review of the state court's denial of Batiste's mitigation ineffectiveness claim, jurists of reason could not debate whether the state habeas court acted contrary to or unreasonably applied *Strickland* in concluding that Batiste failed to make "a substantial showing of the denial of a constitutional right"[29] because Batiste's trial counsel acted in an objectively

---

[28] We have highlighted the relevance in IATC claims of counsel's decision to *disregard* expert recommendations actually given to counsel to seek more testing. *See, eg. Lockett v. Anderson*, 230 F.3d 695, 711-714 (5th Cir. 2000).

[29] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations and citations omitted).

No. 17-70025

reasonable manner in investigating, selecting and presenting mitigation evidence.

\*    \*    \*

For the foregoing reasons, Batiste's request for a COA is DENIED.